484 P.2d 639

**ARIZONA TITLE INSURANCE AND TRUST COMPANY, an Arizona corporation, Appellant and Cross-Appellee,**

v.

**O'MALLEY LUMBER COMPANY, a Corporation, et al., Appellees and Cross-Appellants.**

**ALL MICA, INC., a corporation, Appellants,**

v.

**ARIZONA TITLE INSURANCE AND TRUST COMPANY, an Arizona corporation, Appellee.**

**No. I CA–CIV 1179.**

Court of Appeals of Arizona,
Division 1,
Department B.

May 11, 1971.

Rehearing Denied Sept. 13, 1971.

Review Denied Oct. 13, 1971.

Renaud, Cook, Miller & Cordova by J. Gordon Cook, Phoenix, for appellant and cross-appellee, Arizona Title Ins. and Trust Co.

Marks & Marks by Philip J. Shea, Phoenix, for appellees, cross-appellants and all other appellants.

HAIRE, Judge.

The appellant, Arizona Title Insurance and Trust Co. ("Arizona Title"), appeals from a judgment holding it liable for *negligent* misrepresentations made by it to each of seven contractors (including materialmen) to the effect that it either had in its capacity as "Builder's Control" escrow agent sufficient funds or that there would be sufficient funds available to pay the contractors for work or materials which they subsequently performed on or furnished to a construction project. The seven contractors referred to are appellees; the eighth appellee is a contractor to whom the trial court found that Arizona Title had made a similar but *intentional* misrepresentation. The appellees cross appeal, claiming interest from the date their claims fell due to the date of judgment. There is also before us another appeal, erroneously designated a cross appeal, prosecuted by five other contractors to whom Arizona Title was held not liable. For convenience in identification, we will call these five contractors "counter-appellants".

We shall at this point state the mainstream facts which have applicability or give understanding to all aspects of the case. Additional facts will be stated where necessary in connection with specific contentions.

Chiefly in consideration of assuming existing mortgage indebtedness, Fortner Bell and his wife acquired for $38,400.00 a parcel of land in the City of Phoenix. Bell wished to erect an apartment building on the land, and to that end he had plans drawn and a prospective appraisal of the project made by an MAI appraiser. After obtaining a $210,000.00 "permanent" loan commitment from an insurance company, Bell approached the Bank of Scottsdale (hereinafter "the bank") for a loan to pay off the major ($27,917.59 principal) existing mortgage indebtedness and for a con-

struction financing loan in the amount of $195,000.00.

The bank gave Bell a mortgage loan to pay off the existing $27,917.59 mortgage indebtedness and further agreed to lend him the $195,000.00 he sought for construction financing, payable in five installments of $39,000.00 each, provided that the loan given him to liquidate the $27,917.59 indebtedness was first repaid so that a mortgage securing the $195,000.00 loan would have a first priority position. Bell subsequently approached Arizona Title in August 1963 for a loan to repay the bank's initial loan. Arizona Title performed a title search which showed that the land was also subject to the lien of a judgment against Bell. Arizona Title agreed to lend Bell $37,000.00 to remove these two encumbrances. It was also agreed between Arizona Title, Bell and the bank that Arizona Title would receive the construction loan proceeds from the bank and act as disbursing agent pursuant to a "Builder's Control Agreement". The $37,000.00 loan by Arizona Title to Bell was to be repaid by equal appropriations out of the first four $39,000.00 installments disbursed by the bank to Arizona Title.

The Builder's Control Agreement was executed in September 1963, after construction had begun. By its terms, Bell was required to furnish Arizona Title with complete plans and specifications for the conterplated improvements and to submit a complete breakdown of all direct and indirect costs to be incurred. Bell, who acted as his own construction supervisor, was also required to supply Arizona Title with firm contracts from contractors and materialmen. Of these, at the outset, Bell furnished only a very general cost breakdown, which indicated construction costs of $158,316.62. This figure was in sharp contrast to a cost estimate contained in the MAI appraisal submitted by Bell to Arizona Title with his loan application, which put estimated construction cost at $273,-593.00. No plans and specifications beyond those contained in the MAI appraisal were ever submitted to Arizona Title, and the various contracts were received by Arizona Title "in dribs and drabs" while construction was in progress through January 1964.

As indicated by the trial court's findings, Arizona Title could have calculated at the inception of its Builder's Control escrow that out of the $195,000.00 construction loan proceeds, it was to receive a total of $40,309.96 in repayment of its loan to Bell and for other services,[1] and that another financial institution was to receive the sum of $7,876.41 in repayment of another existing mortgage. This left $146,813.63 out of the construction loan proceeds which could be applied to the costs of actually planning and constructing the improvements. It is to be noted that this last figure is more than $11,000.00 short of the general cost breakdown which Bell gave to Arizona Title, over $60,000.00 short of the commitment for permanent financing, and some $125,000.00 short of the cost estimate appearing in the MAI appraisal which Bell had submitted to Arizona Title.

Subsequent to execution of the Builder's Control Agreement, each of the appellee contractors contacted Raphael Constand, Arizona Title's employee in charge of the Builder's Control escrow, with respect to the apartment construction project. The tenor of each of the various telephonic communications differed, but generally witnesses for the appellee contractors testified that Constand told them in substance that money was either on hand or would be available to pay them for their labor and materials. Testimony was also adduced that appellees furnished labor and/or materials, for which they were not paid, in reliance upon these representations by Constand.

The claims of all contractors and materialmen on the substantially completed project exceeded $259,000.00. The bank stopped disbursing loan proceeds to Arizona Ti-

1. $37,531.96 in repayment of the loan with interest, $1,950.00 as its 1% escrow serv-ice charge, and $828.00 to pay the mort-gagee's title insurance policy premium.

**490**

tle on the then-recognizably troubled project after the fourth installment, at which time $156,000.00 had been disbursed. A secondary construction financing source, eagerly sought as the project progressed, failed to materialize. The plaintiff contractors (appellees and counter-appellants) brought their claims against Arizona Title through a joint third-party complaint in litigation commenced by the bank to foreclose its mortgage. In a trial to the court sitting without a jury, the trial judge found that the eight appellees either entered into their contracts or performed some specified portion of their contracts for which they were not paid in reliance upon the aforementioned statements (seven negligent and one intentional) of Constand. The trial judge further found that none of the five counter-appellants had performed proven services subsequent to or in reliance upon false statements by Constand.

### THE STATUTE OF LIMITATIONS ISSUE

Arizona's Title's first asserted ground for reversal is a statute of limitations argument based upon the fact that appellees did not amend their complaint to state a claim for negligent misrepresentation until more than two years after the alleged misrepresentations were made.

Appellees' original third-party complaint was in two counts. The first count asserted dual bases of liability by reason of (1) appellees' alleged third party beneficiary status under the Builder's Control Agreement, and (2) Arizona Title's alleged position as trustee for the sole benefit of appellees under the same agreement. Arizona Title was granted summary judgment on both grounds of this first count and the judgment became final pursuant to the provisions of Rule 54(b) of the Rules of Civil Procedure, 16 A.R.S. The second count pleaded a statement or assurance by Arizona Title that it had sufficient funds to pay the contractors and a promise to pay them. In its brief in this Court Arizona Title describes this second count as pleading "offensive promissory estoppel". The

second count was later amended to allege, in substance, that Arizona Title tortiously misled the appellees.

 Under Rule 15(c) of our Rules of Civil Procedure, a claim in an amended complaint "relates back" if it arose out of the same "conduct, transaction, or occurrence" set forth in the original pleading. We recently explored the meaning of this provision at some length in Neeriemer v. Superior Court, 13 Ariz.App. 460, 477 P.2d 746 (1970) (petition for review denied, No. 10331–PR January 12, 1971). Where the factual setting is the same, relation back will not be defeated by a change in the theory of recovery from contract to tort, see 3 J. Moore, Federal Practice § 15.15 [3], at 1030 (2d ed. 1968), particularly, we would add, where the change is the relatively slight one from estoppel to misrepresentation and reliance. For the reasons set forth in Neeriemer, *supra,* plaintiffs' amended claim related back to the original third-party complaint and was not defeated by the statute of limitations.

### THE PROPRIETY OF ALLOWING RECOVERY FOR NEGLIGENT MISREPRESENTATION

As indicated above, the trial judge found that Arizona Title made an intentional misrepresentation to one of the appellee contractors. With respect to the seven other appellee contractors, we construe the trial judge's comprehensive findings, conclusions and judgment to be based upon negligent as opposed to fraudulent or intentional misrepresentation. It is strenuously contended by Arizona Title that under the facts and law of the case it could not have any liability to any of the appellees for negligent misrepresentation.

Arizona Title advances two lines of argument in urging its nonliability for negligent misrepresentation. The first is that it had no *duty* to speak accurately to the contractors with regard to the availability of funds for payment because it was not part of the "end and aim" of Arizona Title's business as escrow agent to make representations on the subject. The second line of argument

is closely related but stresses the lack of privity of contractual relationship between Arizona Title and the contractors.

We are not aware of any Arizona authority which affirms the existence of a cause of action for *damages* for negligent misrepresentation.[2] The action is, however, now established in both the American and English jurisprudence, principally, if not exclusively as a vehicle for recovery of a loss sustained through a business or professional relationship. International Products Co. v. Erie R. R. Co., 244 N.Y. 331, 155 N.E. 662, 56 A.L.R. 1377 (1927); Falls Sand and Gravel Co v. Western Concrete, Inc., 270 F.Supp. 495, 500 et seq. (D.Mont.1967); W. Prosser, Handbook of the Law of Torts § 102, at 719 et seq. (3rd ed. 1964); 1 F. Harper and F. James, The Law of Torts § 7.6 (1956); Restatement of Torts § 552 (1938); Restatement (Second) of Torts § 552 (Tent. Draft No. 11, 1965), approved in Tartera v. Palumbo, Tenn., 453 S.W.2d 780, 784–785 (1970); Restatement (Second) of Torts § 552 (Tent. Draft No. 12, 1966); Hedley Byrne & Co. v. Heller & Partners, 2 All E. R. 575 (House of Lords 1963), analyzed at 74 Yale Law Journal 286 (1964).[3]

Arizona Title does not contend that negligent misrepresentation should not give rise to damages in a proper case, and we know of no reason why this established cause of action should not be recognized in Arizona. We note that there is disagreement as to whether the proper form of the action is one for negligence, subject to the usual negligence defenses, or one for fraud, but without the element of scienter, or perhaps a hybrid form of action.[4] This issue has not been presented to us here.

The rule regarding liability for negligent misrepresentations in business transactions is stated in § 552 of the present Restatement of Torts (1938) as follows:

"§ 552. Information Negligently Supplied For the Guidance of Others.

"One who in the course of his business or profession supplies information for the guidance of others in their business transactions is subject to liability for harm caused to them by their reliance upon the information if

"(a) he fails to exercise that care and competence in obtaining and communicating the information which its recipient is justified in expecting, and

"(b) the harm is suffered

(i) by the person or one of the class of persons for whose guidance the information was supplied, and

(ii) because of his justifiable reliance upon it in a transaction in which it was intended to influence his conduct or in a transaction substantially identical therewith."

The subsequent tentative drafts of the *Restatement* change the opening portion of the rule to make reference to one who supplies false information in a "transaction in which he has a pecuniary interest", but there is no apparent intent to effect an enlargement of duties by this change. *See* Tentative Drafts 11 and 12, *supra*.

A good, brief summary of the law in this area is contained in 65 C.J.S. Negligence § 20 (1966). We quote from this treatise, as have several other[5] courts:

"Although it has been held that ordinarily there is no liability for words neg-

2. It has, however, been held that an "innocent" misrepresentation will support a suit for rescission. *See* Lehnhardt v. City of Phoenix, 105 Ariz. 142, 144, 460 P.2d 637, 639 (1969).

3. The extensive law review literature on the general subject is set forth in *Prosser, supra*.

4. *Cf.* Tartera v. Palumbo, *supra*, Falls Sand and Gravel Co. v. Western Concrete, Inc., *supra*, and Jardine v. Bruns-

wick Corp., 18 Utah 2d 378, 423 P.2d 659 (1967); and *see Prosser, supra*,. footnote 22, at 721.

5. Lesser v. William Holliday Cord Associates, Inc., 349 F.2d 490, 493 (8th Cir. 1965); Falls Sand and Gravel Co. v. Western Concrete, Inc. *supra*; Delta Construction v. Mississippi Valley Gas, 254 Miss. 901, 906, 183 So.2d 186, 188 (1966).

ligently spoken, under most authorities a false statement negligently made may be the basis of a recovery of damages for injury or loss sustained in consequence of reliance thereon.

"To support a cause of action on this ground, some special relationship between the parties has been required. So, in order that such liability may exist, it is necessary that the relationship of the parties, arising out of contract or otherwise, be such that one has the right to rely on the other for information, that the one giving the information should owe to the other a duty to give it with care, that the person giving the information should have, or be chargeable with, knowledge that the information is desired for a serious purpose, that the person to whom such information is given intends to rely and act on it, that, if the information given is erroneous, the person to whom it is given will be likely to be injured in person or in property as a result of acting thereon, and that the complaining party is injured by the erroneous information.

"Accordingly, it is not every casual response, or every idle statement, no matter how damaging the result, which will give rise to a cause of action, and a false statement cannot give rise to a cause of action in negligence where the maker thereof was under no duty to the person addressed, or the person relying thereon, to advise him correctly, or the facts were equally within the observation of both, or where the nature and extent of the transaction that will be regulated by the information are not known." (Footnotes omitted).

█ In the matter at bar, it is the law of the case that Arizona Title owed no contractual or trust duty to the contractors, and we are in agreement with Arizona Title to the extent of stating that *apart from any representations made by Arizona Title to*

*the contractors concerning the availability of funds,* it did not owe the contractors the duty of making any calculations to ascertain whether sufficient funds would or would not be available to pay the contractors for their work. In other words, Arizona Title had no duty to speak or respond to the contractors' inquiries at all. But if it chose to speak, we think that under all of the circumstances its business relationship with the contractors carried with it a duty to exercise reasonable care in making representations about presently ascertainable facts.

In the first place, while it was not the "end and aim" [6] of Arizona Title's business in its capacity as Builder's Control escrow agent to give out information as to the amount of construction funds it had on hand, it was the end and aim of its business to see to it that the contractors got paid for their work out of whatever funds were available. As the builder's disbursing agent to the contractors, Arizona Title was necessarily and intimately involved with the contractors in the most vital kind of business relationship. Contrast Renn v. Provident Trust Co., 328 Pa. 481, 196 A. 8 (1938); Vartan Garapedian, Inc. v. Anderson, 92 N.H. 390, 31 A.2d 371 (1943). This relationship of itself may be said to give rise to a duty to exercise reasonable care in making representations about presently ascertainable facts, but we are not compelled to so hold, because Arizona Title's "end and aim" argument is further blunted by its own substantial financial interest in carrying forward the construction project. In asserting as it does in its brief that it was merely an abstracter, Arizona Title shuts its eyes to the fact that it was also in the transaction as a substantial money lender, and that in its status as creditor it was a co-recipient with the contractors of a large portion of the first four loan installments. This circumstance gave an added dimension to the relationship between the

6. The term "end and aim" is found in Judge Cardozo's opinion in Glanzer v. Shepard, 233 N.Y. 236, 242, 135 N.E. 275, 277, 23 A.L.R. 1425, 1428 (1922), and subsequent New York decisions reviewed by Judge Cardozo in Ultramares Corp. v. Touche, cited *infra*.

parties, it being in the pecuniary interests of Arizona Title to keep the contractors working so as to assure that continued draws of money would be available to repay its own loan. Therefore we affirm the existence of a duty on the part of Arizona Title to speak with care and a corresponding right to reliance in the contractors.

In so holding, we emphasize that Arizona Title's duty was to exercise reasonable care not to misstate existing, ascertainable facts. It could not be liable for statements of opinion, see 37 Am.Jur.2d Fraud and Deceit § 45 et seq. (1968), or for representations as to future matters not reasonably understandable as being representations of existing fact. 37 Am.Jur.2d Fraud and Deceit § 57 et seq. (1968).

■ Arizona Title's second line of argument is based upon the principles underlying the decision in Phoenix Title & Trust Co. v. Continental Oil Co., 43 Ariz. 219, 29 P.2d 1065 (1934), and the negligence claim in Ultramares Corp. v. Touche, 255 N.Y. 170, 174 N.E. 441, 74 A.L.R. 1139 (1931). In these cases, the defendants negligently prepared and certified an abstract of title to real property and an audit, respectively. The abstract and the audit were relied upon by the plaintiffs in the two cases, who were in no contractual or other characterizable relationship with the respective defendants. The courts in both cases absolved the defendants of liability for negligence to the damaged plaintiffs, holding in effect that liability for negligence was limited to the parties with whom the abstracter and auditor were in a contractual relationship. The opinions in both cases indicate a strong judicial unwillingness to hold the defendants responsible to a class of persons of unknown magnitude who might, unbeknownst to the defendants, make use of and rely upon their statements.

The reasoning and result of Ultramares are hotly debated today,[7] but this Court would be bound to apply Phoenix Title if its reasoning is applicable here. In our view, it is not. We think counsel for appellees strikes the right distinguishing chord when he states in effect that if there is "privity of contact", there need not be "privity of contract". In other words, the appellees in the present case do not seek to hold Arizona Title for statements made to its contractee Bell, or to any other third person, but only for statements made *directly to each individual appellee contractor*. We think that the Phoenix Title case is clearly distinguishable, and that the reasoning of the leading authorities in the area, cited *supra,* supports liability to an *identified* representee to whom the defendant makes a *direct* representation.

Arizona Title abandoned a statute of frauds argument contained in its opening brief, and as the statement of facts indicates, there is evidence to support the *court's finding that Arizona Title had means of knowing* that it did not or could not have sufficient funds on hand to meet the contractors' claims. Accordingly, at this point we must affirm the judgment in favor of the appellee Merritt Electric, Inc., as to which Arizona Title raises no further contentions.

## IS RECOVERY DEFEATED BY PRIOR CONTRACTUAL OBLIGATION?

Arizona Title's next contention is directed at the five appellees which contracted in writing to perform work on the apartment project prior to the time that Arizona Title made any representations to them. Pointing to the established contractual obligation, Arizona Title relies upon the principle that even where a misrepresentation might be considered fraudulent, there "can be no recovery * * * for a deception by which a person is in-

7. *See* Rusch Factors, Inc. v. Levin, 284 F.Supp. 85, 90–91 (D.R.I.1968), and Prosser, Misrepresentation and Third Persons, 19 Vand.L.Rev. 231 (1966); and *see* Investment Corp. of Florida v. Buchman, 208 So.2d 291 (Fla.App.1968).

duced to do something which he is already bound to do." Berry v. Robotka, 9 Ariz. App. 461, 468, 453 P.2d 972, 979 (1969); *see also* Davis v. Standard Accident Ins. Co., 35 Ariz. 392, 278 P. 384 (1929).

The five appellees in question entered into contracts with Bell Realty & Development, Inc., a corporation formed by Bell to take title to the apartment upon completion of construction. The inference to be drawn from the findings and the evidence is that the corporation had come into legal existence, though no money had been transferred to it and no stock had been issued,[8] and we will assume that the corporation had the power to enforce the five contracts in question.

The five appellees do not quarrel with the proposition quoted from Berry v. Robotka, *supra,* which is a corollary to the basic rule that the injury sustained must have proximately resulted from reliance upon the misrepresentation proved. *See* 37 Am.Jur.2d Fraud and Deceit § 223 (1968). Appellees rely upon the insolvency of Bell Realty & Development, Inc., and upon the rule of law which excuses performance when the other party to the contract is prospectively unable to fulfill his part of the bargain. Restatement of Contracts § 287 (1932).

■ The trial court found as a fact that Bell Realty & Development, Inc. was "not able to pay any part of its obligations to [appellees] . . . other than what could be paid from the builder's escrow and it in fact did not do so." This was equivalent to a finding of insolvency. As we view the matter, Arizona Title's strongest argument is that insolvency by itself is neither an anticipatory breach of contract nor does it work a discharge or dissolution of the contract, but instead is simply an occasion for the opposing party to demand tender or security, as stated in § 287 of the Restatement of

Contracts. But granting this, appellees were still not bound to render a performance for which by reason of insolvency they would not receive the agreed consideration. We do not think the rule of Berry v. Robotka, *supra*, defeats recovery for a misrepresentation where the representee has a valid defense to the prior contractual obligation, and we think such a defense was adequately shown here.

At this point we affirm the judgment in favor of Paradise Cabinet Shop, Inc., as to which no further contentions are raised.

## THE SUFFICIENCY OF THE EVIDENCE OF NEGLIGENT MISREPRESENTATION

Arizona Title next challenges the sufficiency of the evidence of negligent misrepresentation to support judgments in favor of five of the contractors. We think that Arizona Title has a valid point with respect to one of the judgments in question, but we affirm the other four.

■ In our view, the testimony pertaining to the claim of O'Malley Lumber Company was too equivocal to support a judgment in its favor. Near the end of his testimony, the witness for O'Malley testified as follows on redirect examination:

"Q [By Mr. Shea to Mr. Childers] Mr. Constand until it was too late, as far as you were concerned, did not tell you that there was a shortage of funds?

"A No.

"Q Did he tell you at any time that there were enough funds?

"A Well—

"Q For you to get paid?

---

8. Under A.R.S. § 10–126, subsec. A, corporate existence and the ability to transact business commences upon issuance by the Corporation Commission of a certificate of incorporation. *See* 8 W. Fletcher, Cyclopedia of the Law of Private Corporations § 4064 (1966).

"A No, I can't answer that correctly, yes or no.

"THE COURT: Well answer it then.

"THE WITNESS: He didn't specifically say there was enough funds * * *."

We conclude that the judgment in favor of O'Malley Lumber Company should be reversed.

Witnesses for each of the other four contractors in question testified that Constand told them (in three cases) that funds were available to pay them for their work, or that (in one case) "Arizona Title would have the money to pay with". The point stressed by Arizona Title is that some of these witnesses did not state, as did the witnesses in support of the Merritt Electric and Paradise Cabinet claims, that Constand said in effect that Arizona Title actually had the necessary money presently in its possession. But the term "available" can be readily interpreted to mean substantially the same thing. See the definition in Garrison Independent School District v. McDuffie, 414 S.W.2d 492, 496 (Tex.Civ. App.1967) and Duncan v. United States, 368 F.2d 98, 102 (5th Cir. 1966). We have studied the testimony in question, and while we may not have given all of it the same credit as did the trial judge in his role as finder of fact, we think that it is sufficient to support the judgments in question. We accordingly affirm the judgments in favor of Arizona Sash Door and Glass Company, Arizona Sand and Rock Company, J. H. Welsh & Son Contracting Co., and Ralph Wilkens, doing business as Ralph Wilkens Company.

### ALLEGED ERROR AS TO DATE OF INTENTIONAL MISREPRESENTATION

■ Arizona Title's last contention relates to the claim of Alfred Runft & Son Painting & Decorating, a partnership, to which the trial court found that an intentional misrepresentation had been made, at a time when Constand was actually aware that funds to pay contractors were insufficient. Arizona Title labels "clearly erroneous" the trial court's finding that the telephone call in question took place as late as the first part of January 1964, as testified by the witness for the contractor. It was for the trial judge who heard the witnesses to judge their credibility. We do not agree with Arizona Title that the testimony was on its face patently incredible.

### THE CROSS APPEAL

The successful contractors contend on the cross appeal that their claims were liquidated and that they were entitled to interest prior to judgment from the dates their various claims fell due.

■ In response, · Arizona Title first argues that prejudgment interest could not be awarded because it was not sought in the body of the contractors' amended complaint. We think the terms of Rule 54(d) of our Rules of Civil Procedure [9] dispose of this argument. See Checker, Incorporated v. Zeman, Nev., 467 P.2d 100 (1970).

Arizona Title next contends, in effect, that prejudgment interest cannot be awarded with respect to tort claims, where there is a good faith dispute as to liability. The issue thus framed compels a review of the authorities on the subject.

In Arizona Eastern R. Co. v. Head, 26 Ariz. 259, 262, 224 P. 1057, 1058–1059 (1924), the court stated:

"Interest is the compensation paid for the use of money. It is allowed on the ground of some contract, express or implied, to pay it, or as damages for

9. " * * * Except as to a party against whom a judgment is entered by default, every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings."

the breach of some contract, or the violation of some duty. * * * In cases of torts, such as libel, slander, and actions for damages for personal injuries, interest is added, after the claim is liquidated, as compensation for the detention of the money from the judgment creditor. If the claim is unliquidated and is in dispute no interest is allowed upon the theory that the person liable does not know the sum he owes and therefore can be in no default for not paying."

The rule that there could be no prejudgment interest on "unliquidated" claims was reaffirmed on the basis of the last sentence quoted from the Arizona Eastern R. Co. v. Head case in Schwartz v. Schwerin, 85 Ariz. 242, 249–250, 336 P.2d 144, 149 (1959), which involved a *quantum meruit* claim for services rendered. We do not see in these cases, however, any essential distinction between *contract* claims and *tort* claims. Apart from the inherently unmeasurable damages to the personality mentioned in the earlier case, there is nothing to indicate that a tort claim cannot be a prejudgment interest-bearing "liquidated" claim. Nor do we find any other Arizona authority which speaks directly to the issue.[10] Turning to the general law, we find that there seems to be a cautious trend toward granting a plaintiff in tort prejudgment interest on a liquidated claim. C. McCormick, Damages § 55 (1935), hereinafter cited as McCormick; 22 Am.Jur.2d Damages §§ 189, 190 (1965); Comment, Interest as Damages in California. 5 U.C.L.A. Law Review 262 (1958). Another work states the general rule to be that awarding prejudgment interest in a tort case is a matter of discretion rather than a matter of right. 25 C.J.S. Damages § 53 (1966).

▮ Were we to adopt the view that an award of prejudgment interest on a liquidated tort claim is a matter of judicial discretion or at the discretion of the finder of fact, we think that there would be little difficulty in affirming the withholding of interest in the present case, at least as to the seven appellees and cross appellants to whom no intentional misrepresentation was made. But a rule of discretion in this area has been criticized, *see* McCormick § 55, and in our view the potential for arbitrary application is too great to be consistent with the simple but basic principle of equal justice under law. In line with what appears to be the soundly conceived modern trend of authority, we hold that interest is awardable as a matter of right in the case of a liquidated tort claim. Addressing ourselves directly to Arizona Title's contention, we do not think that a good faith dispute over liability defeats such a recovery of prejudgment interest on a *liquidated* claim. *Cf.* Fluor Corp. v. United States ex rel. Mosher Steel Co., 405 F.2d 823, 829–830, note 14 (9th Cir. 1969).

▮ The next question is whether the claims involved here are "liquidated". The case of Feighner v. Clarke, 2 Ariz.App. 286, 290, 408 P.2d 219, 223 (1965), vacated and reversed on other grounds, 101 Ariz. 334, 419 P.2d 513 (1966), cites as a definition of the term "liquidated claim" one which does "'not require evidence to establish it, but rested upon a mathematical computation.'" This strikes us as an overly restrictive definition, and we prefer Professor McCormick's definition as set forth in the black letter text of § 54 of his work on Damages, cited *supra*:

"A claim is liquidated if the evidence furnishes data which, if believed, makes it possible to compute the amount with exactness, without reliance upon opinion or discretion."

---

10. *Cf.* Rossi v. Hammons, 34 Ariz. 95, 104, 268 P. 181, 184 (1928); Ulan v. Richtars, 8 Ariz.App. 351, 357, 446 P.2d 255, 261 (1968); Cole v. Gerhart, 5 Ariz.App. 24, 27, 423 P.2d 100, 103 (1967); King Realty Inc. v. Grantwood Cemeteries, Inc., 4 Ariz.App. 76, 82, 417 P.2d 710, 716 (1966); DePinto v. Provident Security Life Ins. Co., 374 F.2d 37, 49 (9th Cir. 1967, applying Arizona law), certiorari denied, 389 U.S. 822, 88 S.Ct. 48, 19 L.Ed.2d 74 (1967).

By this test, most if not all of the claims on which the successful plaintiffs were awarded judgment were liquidated claims, and they were, accordingly, entitled to prejudgment interest at the statutory rate of 6%, from and after the date when demand for payment was made upon Arizona Title, which may be but is not necessarily the date upon which the various claims in question "fell due". The cause will be remanded to the trial court for ascertainment from the record of these matters and entry of an amended judgment.

## THE "COUNTER-APPEAL"

The trial court found that the five counter-appellants did not furnish goods or services in reliance upon any representation by Arizona Title directed to them. These contractors contend that they should have been permitted to recover on the theory that the earlier misrepresentations to other contractors were actually fraudulent and intended to influence the conduct of all of the contractors as a class. The the short answer is that the trial judge did not find any such broad, fraudulent conduct, and the evidence did not require it to make such a finding.

The last contention is advanced in behalf of a contractor whose only contact with Arizona Title was a telephone conversation with an anonymous employee. The authority of the anonymous employee to speak for Arizona Title was of course not shown, and there could be no justifiable reliance upon a communication of this nature.

The judgment in favor of O'Malley Lumber Company is reversed. Excepting only the matter of prejudgment interest, the remaining portion of the judgment is affirmed. The cause is remanded to the trial court for further proceedings consistent herewith.

JACOBSON, P. J., and EUBANK, J., concur.