654 P.2d 4

In the Matter of the ESTATE OF Wilbur Calvin ESTES, also known as W.C. Estes, deceased.

Mary Rose ESTES, Contestant Appellant, Cross Appellee,

v.

VALLEY NATIONAL BANK OF ARIZONA, a National Banking Association, individually and as Executor of the Estate of Wilbur Calvin Estes, deceased, Executor Appellee, Cross Appellant.

No. 1 CA–CIV 5014.

Court of Appeals of Arizona, Division 1, Department B.

April 29, 1982.

On Motion for Rehearing Sept. 16, 1982.

Review Denied Nov. 9, 1982.

Romley & Sherk by Elias M. Romley, Arthur E. Romley, Phoenix, for contestant appellant, cross appellee.

Gust, Rosenfeld, Divelbess & Henderson by Richard H. Whitney, Richard A. Segal, Phoenix, for executor appellee, cross appellant.

## OPINION

JACOBSON, Presiding Judge.

This appeal concerns an attempt to surcharge the executor-trustee, Valley National Bank, for the negligent mishandling of the estate of W.C. Estes, deceased. In particular, surcharging was sought because: (1) the bank overstated the value of the estate thereby causing overpayment of estate taxes; (2) the bank failed to take proper deductions on the federal estate tax returns thereby causing an overpayment of estate taxes; and (3) the bank failed to properly supervise a wholly owned corporation of the decedent which resulted in losses to the estate. In addition, the objector contends the trial court improperly allowed executor and attorneys' fees and improperly disallowed pre-judgment interest on sums with which the trial court found the bank should be surcharged.

The objector in these proceedings is Mary Rose Estes, the former wife of the decedent, W.C. Estes, the parties having been divorced on July 7, 1965.

W.C. Estes was injured in an automobile accident on December 8, 1965. He executed his Last Will and Testament on December 21, 1965 and died on December 25, 1965. He was survived by three sons, then 18, 14 and 10 years old.

Pursuant to the wishes expressed in the decedent's will, the Superior Court issued letters testamentary appointing Valley National Bank of Arizona (hereinafter bank) as executor and admitting the will to probate. Attorney Richard Minne, the decedent's former personal attorney, was selected by the bank to serve as its attorney in connection with the estate of W.C. Estes.

The will included a testamentary trust for the benefit of the decedent's sons which was to terminate when the youngest boy reached age 23. The bank serves as trustee of the testamentary trust. Pursuant to a "wrap-around" trust agreement, Mrs. Estes became the trustee for her sons over the property which was theirs under the testamentary trust. As trustee, she is to take the assets from the bank as they are distributed to her sons, to hold them in trust and to distribute one-half of each child's share upon the child becoming age 30 and the other one-half at age 35.

In addition to being the trustee for her three sons, Mrs. Estes is a substantial creditor of the estate. She has expended the following sums on behalf of the estate: $99,407.70 for federal estate taxes; $9,279.90 for Arizona estate taxes; $32,-466.77 for income taxes owed by W.C. Estes; $117,657.50 to exercise an option the estate held to acquire land and for the purchase of personal property for Garbage Service Corporation, a corporation wholly owned by the estate; $2,365.00 for a delinquent mortgage payment owed by W.C. Estes; and $423.85 for rent which was due from W.C. Estes. These advances total $261,600.72.

Very little activity, other than the payment of estate taxes, occurred in connection with the estate from 1966 until 1970. In that year, three minute entry orders were entered by superior court commissioners requiring the bank to file an account; however, none of the orders were complied with.

In 1971, similar orders directing an account to be filed were entered on February 9, March 16, May 11 and June 29. On July 2, 1971, the bank filed its "First Account and Report of Executor" for the period March 17, 1966 through May 31, 1971. This account did not seek approval of the bank's handling of the estate tax return and did not determine the matters about which Mrs. Estes has made objections.

On December 12, 1972, a court commissioner again entered an order requiring an account to be made by the bank. On January 17, 1973, the bank, now represented by the law firm of Gust, Rosenfeld & Divelbess, filed its "Second Account and Report of Executor."

On February 7, 1973, Mrs. Estes filed objections to the "Second Account and Report of Executor." On May 1, 1974, the bank filed a petition for: "Order Approving Amended Second Account and Report; Order of Complete Statement; and Decree of Distribution." Objections were filed to the amended second report.

After a hearing on the objections to the second report and the amended second report, the trial court entered an order surcharging the bank $32,314.37 for negligent overpayment of estate taxes and for the erroneous payment of property taxes on land the estate did not own, denied interest to the estate on the amount surcharged, denied all other objections and approved the bank's executor commission of $13,500 and its attorneys' fees of $5,189.50. On appeal Mrs. Estes challenges the trial court's denial of her objections regarding: (1) the inclusion of life insurance proceeds in the taxable estate; (2) the bank's failure to take advantage of certain deductions from the gross estate; (3) the bank's failure to account for the receipts of Garbage Service Company; (4) the award of an executor's fee and attorneys' fees; and (5) the denial of interest on all amounts surcharged to the bank.

The bank cross-appealed from the trial court's order insofar as the order (1) found that Mrs. Estes has standing to contest the amended second account and report and (2) found that the executor wrongfully included a $100,982.42 life insurance policy in the estate for estate tax purposes. The first ground for cross-appeal was abandoned.

■ It is basically the bank's position both as to its cross-appeal and in opposition to Mrs. Estes' appeal that as an executor it is only liable for a breach of duty measured by the standard of care of executors. It further contends that the objector failed to establish that standard of care, or if established, that the bank's conduct did not devi-

ate therefrom. We agree that if the heirs are entitled to relief because of the conduct of the executor, the relief must be predicated on the breach of some duty of the executor legally recognizable. *In Re Sullenger's Estate,* 2 Ariz.App. 326, 408 P.2d 846 (1965). At the time when the administration of this estate was commenced the standard of care for Arizona executors and trustees was that enunciated in the Restatement (Second) of Trusts § 174 (1959):

§ 174 Duty to Exercise Reasonable Care and Skill

The trustee is under a duty to the beneficiary in administering the trust to exercise such care and skill as a man of ordinary prudence would exercise in dealing with his own property; *and if the trustee has or procures his appointment as trustee by representing that he has greater skill than that of a man of ordinary prudence, he is under a duty to exercise such skill.* (Emphasis added). *In Re Sullenger's Estate,* 2 Ariz.App. at 328, 408 P.2d at 848.[1]

■ The testimony by bank·employees was clear that the bank held itself out as having special expertise in the administration of estates and trusts and specifically in the preparation of tax returns required to be filed on behalf of such estates and trusts. The bank therefore owed the Estate of W.C. Estes and the beneficiaries of the testamentary trust set up thereunder, the duty not only to exercise its responsibilities as executor with the care and prudence which is required by any executor, but also to employ the special skills, knowledge and resources it professed to have. This standard of care need not be established by evidence, but is one imposed by law on executors in the position of the bank. We turn then to a determination of whether the bank deviated from this standard.

1. In 1973 the standard of care adopted in *In Re Sullenger's Estate* was subsequently endorsed by our legislature in A.R.S. § 14-7302:

§ 14-7302 *Trustee's standard of care and performance*

Except as otherwise provided by the terms of the trust, the trustee shall observe the standard in dealing with the trust assets that would be observed by a prudent man dealing with the property of another, *and if the trus-*

## NEGLIGENT INCLUSION OF LIFE INSURANCE PROCEEDS IN THE TAXABLE ESTATE

■ The estate tax return filed by the bank reported that $474,671.48 in life insurance proceeds were included in the value of the estate. Prior to filing the return the bank did not obtain copies of the decedent's life insurance policies themselves, copies of form 712's from the insurance companies, or payment schedules from the beneficiaries on the policies.[2] Furthermore, although the bank employee who prepared the estate tax return was personally aware of the decedent's divorce shortly prior to his death, he did not obtain a copy of the judgment and decree of divorce and separation agreement to assist in determining the ownership of assets which were reported in the gross taxable estate. It was only subsequent to filing the return that copies of these documents were acquired by the bank.

The law with respect to whether proceeds of life insurance are included in or excluded from the gross taxable estate of a decedent turns upon a determination of the decedent's incidents of ownership in the policy at the time of death. Section 2042, Internal Revenue Code of 1954, provides in pertinent part:

SEC. 2042 [1954 Code]. The value of the gross estate shall include the value of all property—

\*     \*     \*     \*     \*     \*

(2) RECEIVABLE BY OTHER BENEFICIARIES.—

To the extent of the amount receivable by all other beneficiaries as insurance under policies on the life of the decedent with respect to which the decedent pos-

tee has special skills or is named trustee on the basis of representations of special skills or expertise, he is under a duty to use those skills. (Emphasis added).

2. Form 712's are prepared by insurance companies upon payment of a policy. They report the amount of the policy, the amount of proceeds paid, the beneficiary, policy owner, policy number and other pertinent information.

sessed at his death any of the incidents of ownership, exercisable either alone or in conjunction with any other person. . . .

Clarifying regulations to § 2042 provide:

§ 20.2042–1  Proceeds of life insurance—

\*      \*      \*      \*      \*      \*

(c) *Receivable by other beneficiaries.*

(1) Section 2042 requires the inclusion in the gross estate of the proceeds of insurance on the decedent's life not receivable by or for the benefit of the estate if the decedent possessed at the date of his death any of the incidents of ownership in the policy, exercisable either alone or in conjunction with any other person. *However, if the decedent did not possess any of such incidents of ownership at the time of his death nor transfer them in contemplation of death, no part of the proceeds would be includible in his gross estate under section 2042.* Thus, if the decedent owned a policy of insurance on his life and, 4 years before his death, irrevocably assigned his entire interest in the policy to his wife retaining no reversionary interest therein (see subparagraph (3) of this paragraph), the proceeds of the policy would not be includible in his gross estate under section 2042.

(2) For purposes of this paragraph, the term "incidents of ownership" is not limited in its meaning to ownership of the policy in the technical legal sense. Generally speaking, the term has reference to the right of the insured or his estate to the economic benefits of the policy. Thus, it includes the power to change the beneficiary, to surrender or cancel the policy, to assign the policy, to revoke an assignment, to pledge the policy for a loan, or to obtain from the insurer a loan against the surrender value of the policy, etc. See subparagraph (6) of this paragraph for rules relating to the circumstances under which incidents of ownership held by a corporation are attributable to a decedent through his stock ownership . . . . (Emphasis added).

One of the policies, Northwestern Mutual Life Insurance policy number 5 402 776, specifically designated Mrs. Estes as the owner. The inclusion of the $100,982.42 proceeds of this policy in the decedent's gross estate resulted in the payment of taxes in the sum of $32,314.37. The bank employee who filed the estate tax return admitted that had he known of the ownership designation on this policy, he would have excluded the proceeds of the policy from the gross estate. The trial court determined that the inclusion of this policy was wrongful and surcharged the bank $32,314.37 for the resulting overpayment of taxes.

In its cross-appeal, the bank argues that the insurance company's designation of ownership on the policy does not control the taxability issue. Further, they argue that the policy was community property given to W.C. Estes under the separation agreement, and therefore properly includable in his gross estate. They also urge that even if it is established that W.C. Estes had no incidents of ownership in the policy, the bank still should not have been surcharged for having included it. They claim the evidence established no wrongdoing on their part, in the sense of deviation from a proven standard. We disagree.

As previously set forth, the bank was lacking information regarding policy ownership when it filed the tax return. Policy ownership is at the core of the taxability issue, therefore it stretches this court's credulity to argue that a professional executor-trustee exercising the care and skill it purports to have would include insurance policies in a decedent's taxable estate without proper documentation of policy ownership and other pertinent information. The bank was clearly negligent in doing so. Contrary to the bank's assertions, no expert testimony on this issue was required. Nevertheless, the bank's employee, who qualified as an expert, acknowledged that information regarding policy ownership is required to adequately prepare an estate tax return. Furthermore, this employee acknowledged he would have excluded this policy from the gross estate had he known that Mrs. Estes was named as the policy owner.

■ The basic purpose of administration of an estate is to effect a transmission of a decedent's wealth without essential dimunition. *In Re Wiswall's Estate,* 11 Ariz.App. 314, 464 P.2d 634 (1970). Consistent with this purpose is the executor's obligation to minimize estate taxes in accordance with the facts and the law. *Estate of Gerber,* 73 Cal.App.3d 96, 140 Cal.Rptr. 577 (1977); *In Re Estate of Maurice,* 433 Pa. 103, 249 A.2d 334 (1969); Restatement (Second) of Trusts § 176 (1959) (trustee's duty to preserve the trust property). Where an executor negligently performs its tax responsibilities, it is without question that the executor may be held liable, by means of surcharge, for the loss resulting to a decedent's estate. *Id.*

The bank should have followed the course most beneficial to the estate and not included the proceeds from the Northwestern Mutual Life Insurance Company policy no. 5 402 776 in W.C. Estes' gross taxable estate. That part of the judgment of the trial court, surcharging the bank for the overpayment of $32,314.37 in estate taxes due to the inclusion of Mrs. Estes' insurance policy in W.C. Estes' gross taxable estate is affirmed.

■ Two of the insurance policies included in W.C. Estes' gross estate were owned by Garbage Service Company; and of which Garbage Service Company was the beneficiary: (1) New England Mutual Life Insurance Company policy no. 276 7107 which paid $100,614.48 and (2) Manhattan Life Insurance Company policy no. 466 761 which paid $43,935.76. Garbage Service Company was wholly owned by the decedent. The clarifying regulations to section 2042, Internal Revenue Code of 1965 provide:

20–2042(c)(6): In the case of economic benefits of a life insurance policy on the decedent's life that are reserved to a corporation of which the decedent is the sole or controlling stockholder, the corporation's incidents of ownership *will not be attributed to the decedent through his stock ownership to the extent the proceeds of the policy are payable to the corporation.* (Emphasis added).

■ Under this regulation since Garbage Service Company was the beneficiary of these policies, it was clearly erroneous to include the policies owned by Garbage Service Company in W.C. Estes' gross taxable estate. The bank did not include five other insurance policies which Garbage Service Company owned on W.C. Estes' life in his gross estate, however, the disparate treatment of the subject policies was never explained. The probable explanation is that the bank was without any information as to who owned the insurance policies which it included in the estate tax return. The bank should have been surcharged for the overpayment of taxes resultant from including these policies in the Estes estate; therefore, the decision of the trial court in this regard is reversed.

The proceeds from seven other insurance policies in which W.C. Estes was the owner and Mrs. Estes the beneficiary were reported as part of W.C. Estes' gross taxable estate. The value of these policies aggregated $229,138.82. All of these policies, with the exception of a $1,000.00 policy were acquired during the time that Mr. and Mrs. Estes were married and living in Arizona. The $1,000.00 policy was acquired by W.C. Estes prior to marriage.

At the trial and on appeal Mrs. Estes challenges the inclusion of these policies in W.C. Estes' gross estate. She advances two alternative legal arguments regarding the taxability of the proceeds of these insurance policies. The applicability of each theory turns on the legal question of who held incidents of ownership in the insurance policies acquired during Mr. and Mrs. Estes' marriage at the time of Mr. Estes' death. This question in turn depends upon the effect of Mr. and Mrs. Estes' separation agreement on the subject insurance policies.

A written separation agreement was executed by Mr. and Mrs. Estes on April 20, 1965. This separation agreement was approved by the superior court and incorporated in and made a part of the decree of divorce which was entered on July 7, 1965. The separation agreement provided in part as follows:

6. The Husband shall keep and maintain his life insurance policies in force for the benefit of the boys, or any trust hereafter created wherein the boys will be the beneficiaries. He shall also provide and maintain health, accident and hospitalization insurance for the boys, either by policies secured by him, or through policies in companies with which he is or may be connected.

Mrs. Estes first argues that by the above provision of the separation agreement Mr. Estes agreed to maintain the life insurance policies in effect on the date of the agreement for the benefit of his sons. She argues that by assuming this obligation Mr. Estes divested himself of all incidents of ownership in the undivided one-half of the policies he owned as community property and that therefore none of the proceeds paid on these policies were includable in his gross taxable estate.

Alternatively, Mrs. Estes argues that if it is determined that Mr. Estes held incidents of ownership in the policies at his death, only one-half of the proceeds from the policies should have been included in his taxable estate. This argument is based on the claim that the separation agreement did not divest her of her undivided one-half community property interest in the policies and that upon divorce, she and Mr. Estes continued to hold the policies jointly, or as tenants in common. Therefore, because she owned one-half of the insurance proceeds only one-half of the proceeds were includable in Mr. Estes' gross taxable estate.

■ The cardinal rule in determining the effect of a settlement of community property rights by parties to a divorce suit is to ascertain the intention of the parties as to what interests, rights or property they intended to pass thereby, and to carry out that intention as nearly as possible. *Smith v. Smith,* 71 Ariz. 315, 227 P.2d 214 (1951). The separation agreement of Mr. and Mrs. Estes states:

WHEREAS, it is the intention and desire of the parties hereto that there be a complete final and effective decision in settlement of the custody of the aforesaid

children, the support and maintenance of said children and the wife, *and the division of all the community real and personal property;* (Emphasis added).

By this clause the parties clearly intended to dispose of all their property by their separation agreement. Furthermore, the law contemplates that community property will be divided when a divorce is granted. A.R.S. § 25–318; *Rothman v. Rumbeck,* 54 Ariz. 443, 96 P.2d 755 (1939).

■ Giving effect to the parties stated intent, it appears that the only rational construction of paragraph 6 of the agreement is that Mr. Estes was to be the owner of these policies, but was required to maintain the policies in effect on the date of the agreement for the benefit of his sons. We therefore conclude that Mrs. Estes had no ownership interest in these policies at the time of Mr. Estes' death.

However, we still must determine whether Mr. Estes held incidents of ownership in these policies for tax purposes.

At no time prior to his death did Mr. Estes change the beneficiary designation on these policies from Mrs. Estes to his sons. This fact is not dispositive of the issue of whether Mr. Estes held incidents of ownership in the policies at his death.

■ Generally a named beneficiary of an insurance policy secures only a contingent interest therein, however, "a subsequent agreement of the insured in consideration of a settlement of property rights in contemplation of divorce by the terms of which he contracts to make a party the sole irrevocable beneficiary of the policy vests the party with an equitable interest therein which may not be defeated without that party's consent." *Lock v. Lock,* 8 Ariz.App. 138, 141, 444 P.2d 163, 166 (1968). *See also Shoudy v. Shoudy,* 55 Cal.App. 344, 203 P. 433 (1921); *Mutual Insurance Company of New York v. Franck,* 9 Cal.App.2d 528, 50 P.2d 480 (1935).

Where an individual enters into a property settlement agreement whereby he agrees to maintain life insurance for the benefit of another it has been held that this act di-

vests the individual of all "incidents of ownership" in the subject life insurance policies. *Estate of Chester H. Bowers,* 23 T.C. 911 (1955); *Cowles v. U.S.,* 152 F.2d 212 (2d Cir.1945); *Estate of George F. Hurd,* 9 T.C. 681 (1947).

*In Estate of Chester H. Bowers, supra,* pursuant to the provisions of a property settlement agreement the decedent maintained two policies of life insurance on his life with his former wife as beneficiary and his three children as contingent beneficiaries. No particular policies were mentioned in the agreement, however, it was found that the policies owned at the time of the agreement were committed to the agreement even though they were not specifically mentioned therein. Under the terms of the policies, the decedent reserved the right to revoke and change the beneficiaries, to borrow on the policies and to surrender them for cash. Dividends on the policies were also payable to the decedent.

Upon Mr. Bower's death the insurance proceeds were paid by the insurance company to his former wife. The Internal Revenue Service insisted that the full amount of the proceeds of the policies be included in the decedent's gross estate and that no offsetting deduction be allowed. The estate appealed to the Tax Court contending that the proceeds of the policies should not have been included in the gross estate because the decedent did not hold "incidents of ownership" in the policies at death. The Tax Court held as follows:

> Thus, even though policy number 1960656 by its terms reserved to the decedent the right to change the beneficiary, the agreement vested decedent's former wife "with an equitable interest which may not be divested without her consent." Also decedent could no longer divest the children of their right to the proceeds if their mother died or remarried prior to his death. And, as the insurer was furnished with a copy of the agreement, it also probably was bound thereby. (Citations omitted).

> Furthermore, by promising not to "attempt directly or indirectly to change or cause to be changed, the beneficiary or beneficiaries under said insurance policy or policies," decedent not only lost any right to revoke or change the beneficiaries, but also relinquished any right to surrender the policies for cash or to borrow thereon. (Citations omitted).

> The above conclusions dispose of respondent's [the IRS'] contention that the proceeds of the policies are includible in the gross estate because at his death decedent possessed "incidents of ownership" in the policies within the purview of subsection 811(g)(2)(B). *Cf. George F. Hurd,* 9 T.C. 681; *Cowles v. United States,* 152 F.2d 212, 23 T.C. at 917.

*Cowles v. U.S., supra,* is a case in which a similar situation was presented. Mr. Cowles, in consideration of his wife's surrender of her right to support and to inherit, procured an annuity life insurance policy which was to pay Mrs. Cowles a life income in the event of her husband's death. Mr. Cowles reserved no power to change the beneficiary to the policy. It was held that Mr. Cowles retained no legal incidents of ownership in the policy after he executed the separation agreement wherein he promised to maintain the policy. The policy was not taxable to Mr. Cowles' estate.

Because Mr. Estes was by judicial decree to "maintain his life insurance policies in force for the benefit of the boys" we believe that the above case law establishes a genuine question as to whether Mr. Estes retained sufficient incidents of ownership in the insurance policies to allow such policies to be included in his gross taxable estate. Where an executor is confronted with several alternatives, he is absolutely bound to follow the course which is most beneficial to the estate. *In Re Wiswall's Estate, supra; Estate of Gerber, supra.* Moreover, where an executor in good faith has resolved a question in favor of taxability, he must not forfeit any available statutory procedure whereby a loss resulting from an incorrect decision may be recovered. *Id.* In this case, after request of Mrs. Estes and her attorney, the bank refused to approach the I.R.S. to ask it to

reconsider or amend the estate tax return and recompute the tax, unless Mrs. Estes and her sons would execute a complete release of all claims against the bank. The bank took this position despite Mrs. Estes' willingness to stipulate that approaching I.R.S. would not constitute an admission of error on the bank's part. The bank's refusal to approach the I.R.S. was inconsistent with its duty to minimize estate taxes where Mrs. Estes' challenge to the tax return was credible under the facts and the law.

We hold that the bank's inclusion of these insurance proceeds in the gross estate without ascertaining the legal effect of the property settlement agreement and its subsequent refusal to seek a refund constituted a breach of the bank's duty to preserve the property of the estate. Restatement (Second) of Trusts, § 176.

■ Not only did these acts constitute a breach of the bank's duties, the bank's action precluded final resolution of the issue. Under these circumstances any question concerning the taxability of the proceeds of these policies must be resolved against the party whose action precluded resolution. The bank on remand shall be surcharged in the amount the inclusion of the subject insurance policies resulted in overpayment of estate taxes.

## THE BANK'S FAILURE TO TAKE DEDUCTIONS FROM THE GROSS ESTATE

■ Mrs. Estes also claims the bank negligently failed to take advantage of certain deductions from Mr. Estes' gross estate. She claims two deductions would have become apparent had the bank obtained a copy of the separation agreement. In particular, the separation agreement provided that the decedent would: (1) assume as his sole and separate obligation the present balance due on the mortgage of the residence of the parties, and pay the installments thereon as they became due and payable in the future; (2) purchase for Mrs. Estes a new medium priced automobile to be owned as her sole and separate property;

and (3) provide Mrs. Estes with the sum of $59,175.00, which sum would be paid over a period of ten years.

We acknowledge that the Internal Revenue Code § 2053 (1954) provides for deduction from the value of the gross estate the amount of claims against the estate which are allowable by the laws of the jurisdiction under which the estate is being administered. However, Mrs. Estes failed to present a creditor's claim in the manner required by A.R.S. § 14–3804. Therefore, the estate never became legally obligated to pay these amounts and a deduction for these claims would not have been proper.

## THE BANK'S FAILURE TO ACCOUNT FOR THE RECEIPTS OF GARBAGE SERVICE COMPANY

■ Mrs. Estes additionally claims the bank should be surcharged for failing to account for the substantial receipts of Garbage Service Company (GSC). In particular, she cites the bank's failure to account for approximately $125,000 of insurance proceeds and approximately $47,000 of condemnation proceeds received for real property owned by GSC. She further argues that the bank's administration of the estate constituted carrying on the decedent's business venture without authorization from the probate court in violation of former A.R.S. § 14–542.

The estate of Mr. Estes is simply the sole stockholder of GSC, not the corporation. Therefore, authorization of the court to carry on GSC's business was not required. The bank's obligation was to act as a prudent shareholder, not to run the corporation. *In Re Estate of Massaglia,* 38 Cal. App.3d 767, 113 Cal.Rptr. 751 (1974). Mrs. Estes presented evidence which showed that the bank did not attend shareholder meetings, participate in the election of directors, or in any other manner inquire into the operating status of GSC. While this evidence might show dereliction of the bank's duties to act as a prudent shareholder, Mrs. Estes failed to present any evidence to show that this dereliction harmed the estate. The trial court properly refused to surcharge the bank for these sums.

### THE BANK'S ENTITLEMENT TO EXECUTOR'S FEES AND ATTORNEYS' FEES

Mrs. Estes asserts that the bank is not entitled to an award of fees due to the bank's waste, negligence and mismanagement of the estate and that its attorneys are not entitled to fees because the attorneys' fees requested were incurred solely for the benefit of the bank in defending the charges of Mrs. Estes.

The bank has the burden of establishing the reasonableness of its executor's fees, *In Re Estate of Wiswall, supra,* and its attorneys' fees, *Estate of O'Reilly,* 27 Ariz. 222, 231 P. 916 (1925).

In making an application to the superior court for an award of fees, Rule 5.7, Local Rules of Practice, Superior Court of Maricopa County, 17A A.R.S. requires:

All applications of fiduciaries and attorneys for compensation for services rendered in all proceedings under Title 14, Arizona Revised Statutes, must be accompanied by a statement as to the net value of the estate together with a detailed statement of the services rendered, the time involved and the results achieved. A copy of any such application for compensation shall be served on each party in the estate and the court and proof of such service filed with the court.

The bank's "Petition For: Order Approving Amended Second Account and Report; Order of Complete Settlement; and Decree of Distribution" requested $13,500.00 as an executor's fee and $5,189.50 as attorneys' fees. This petition did not contain the detailed statement of the services rendered, the time involved or the results achieved which is required by Rule 5.7. Furthermore, the bank did not present any testimony at the hearing on the petition to establish the reasonableness of the fees it had requested.

The inventory and appraisement filed on March 23, 1967, indicates the value of the probate estate was $82,751.80. The amended second report filed on May 1, 1974, shows an excess of "known" liabilities over assets of $86,562.78. The amended second report also states that the estate was known to be insolvent from its inception, and that the bank agreed to act as executor upon the representation that Mrs. Estes would pay all expenses of administration and taxes arising because of the decedent's death. In view of these facts and the substantial amount of the fee requested considering the value of the estate, compliance with Rule 5.7 was clearly necessitated.

We are of the further opinion that the bank's actions as executor, as previously outlined, did not benefit the estate, but rather were detrimental and therefore its request for executor's fees should have been denied in its entirety. An executor is expected to earn his commission by attending to his duties with fidelity and in accordance with the provisions of the law. *In Re Estate of Shattuck,* 17 Ariz.App. 103, 495 P.2d 873 (1972). Where, as here, it is shown that an executor's mismanagement and neglect has resulted in substantial losses to the estate, it is an abuse of the trial court's discretion to award executor's fees.

The award of attorneys' fees should also have been denied. As previously stated, the bank did not appropriately document its request for attorneys' fees. The request for fees was made on behalf of Gust, Rosenfeld, Divelbess & Henderon, not the attorney of record for the estate. This law firm seems to have commenced representation of the bank in January of 1973, during the same time period when Mrs. Estes made objections to the accounts filed by it. Without proper documentation of how the requested fee of $5,189.50 was arrived at, the trial court could only speculate as to the nature of the services rendered on behalf of the estate. The bank was not entitled to reimbursement for attorneys' fees for services rendered in the defense of these proceedings. An executor is entitled to reimbursement for attorneys' fees only for services rendered to benefit the estate, not if the services were rendered to protect the executor's personal interest. *Matter of Estate of Stephens,* 117 Ariz. 579, 574 P.2d 67 (App.1978). In view of the bank's fail-

ure to establish that the legal services rendered by Gust, Rosenfeld, Divelbess & Henderson benefited the estate, the award of attorneys' fees is reversed and this matter remanded for a determination of whether the attorneys' fees requested were reasonable and were for services rendered in good faith to benefit the estate. *See* A.R.S. § 14–3720.

## PRE–JUDGMENT INTEREST ON AMOUNTS SURCHARGED TO THE BANK

Mrs. Estes contends that the trial court erred in refusing to award pre-judgment interest on the amounts surcharged. She also requests that pre-judgment interest be awarded on all additional items of surcharge as determined by this court.

In response, the bank argues that the denial of pre-judgment interest was a matter wholly within the discretion of the trial court, and that Mrs. Estes has not carried the burden of showing an abuse of discretion. The bank cites the lapse of time between the payment of estate taxes and Mrs. Estes' assertion of her objections as well as the delay between the time when the objections were filed and judgment as justification for the denial of pre-judgment interest.

We note that the delay in this matter is largely attributable to the bank. As we discussed previously in this opinion, the bank neglected to file the yearly accounts it was required by law to file. It was only after numerous orders of the court that the bank filed two accounts to which Mrs. Estes objected. The bank then refused to approach the Internal Revenue Service to request a refund of estate taxes. (Any refund forthcoming from the I.R.S. would have included interest). Finally, the bank waited until approximately eight years after the decedent's death before petitioning the court for an order approving its final account. In view of these facts, the delay in the settlement of this estate cannot be attributed to Mrs. Estes such that it should result in the denial of pre-judgment interest on any amounts surcharged to the bank.

The pivotal question is whether the claims involved here are "liquidated," that is, is the claim one which "makes it possible to compute the amount with exactness without reliance upon opinion or discretion." *Costanzo v. Stewart Title & Trust of Phoenix,* 23 Ariz.App. 313, 317, 533 P.2d 73, 77 (1975).

If the claim is in fact "liquidated" then the awarding of pre-judgment interest is a matter of right rather than being discretionary. *Arizona Title Insurance & Trust Co. v. O'Malley Lumber Co.,* 14 Ariz. App. 486, 484 P.2d 639 (1971). Even a good faith dispute over liability will not defeat the recovery of pre-judgment interest on such a liquidated claim. *Id. L.M. White Contracting Co. v. St. Joseph Structural Steel Co.,* 15 Ariz.App. 260, 488 P.2d 196 (1971).

The bank attempts to distinguish *Arizona Title Insurance & Trust Co. v. O'Malley Lumber Co., supra,* on the basis that its holding only applies to cases involving liquidated tort claims. The bank cites *Chisholm v. House,* 183 F.2d 698 (10th Cir.1950), for the rule that an award of interest is discretionary in a proceeding of this nature. *Chisholm,* was a case involving an unliquidated claim and Mrs. Estes has not argued that an award of pre-judgment interest in a case involving an unliquidated claim is anything but discretionary with the trial court. An award of pre-judgment interest is required with regard to all liquidated claims involved herein.

Once the data is assembled, the amount by which the wrongful inclusion of insurance proceeds in the decedent's gross estate resulted in the overpayment of estate taxes can be computed with exactness, without reliance on opinion or discretion. Accordingly, the estate is entitled to pre-judgment interest at the statutory rates in effect for the time periods involved from and after the dates when the estate taxes were wrongfully paid.

Similarly, the amount of each erroneous tax payment on the land which the estate did not own can be computed with exact-

ness and was therefore liquidated from the date each such payment was made. It was error for the trial court to deny pre-judgment interest on the amounts it surcharged the bank for the erroneous payment of property taxes.

The cause is remanded to the trial court for ascertainment from the record of the amounts the bank is to be surcharged for the overpayment of estate taxes, and the pre-judgment interest due thereon, together with the amount of pre-judgment interest due on the amount surcharged for the erroneous payment of property taxes and for reconsideration of the request for attorneys' fees upon presentation of proper documentation therefor. The award of executor fees is reversed.

The judgment is accordingly affirmed in part and reversed in part with the cause being remanded to the trial court for further proceedings consistent herewith.

YALE McFATE and R. PORTER MURRY, Judges (retired), concur.

*Note:* The Honorable YALE McFATE and the Honorable R. PORTER MURRY, retired judges of courts of record, were authorized to participate by the Chief Justice of the Arizona Supreme Court pursuant to Arizona Const. art. VI, § 20.

### ON MOTIONS FOR REHEARING

JACOBSON, Presiding Judge.

On May 14, 1982, this court filed its opinion in this matter, which affirmed in part and reversed in part the trial court's judgment and remanded the matter to the trial court for further proceedings. Both parties filed motions for rehearing and respective responses.

The issue raised by the motion for rehearing of appellee Valley National Bank of Arizona (Bank) is that a portion of our opinion dealing with proceeds of insurance is factually in error. In our prior opinion we stated:

Two of the insurance policies included in W.C. Estes' gross estate were owned by Garbage Service Company; and of

which Garbage Service Company was the beneficiary; (1) New England Mutual Life Insurance Company policy No. 2767107 which paid $100,614.48 and (2) Manhattan Life Insurance Company policy No. 466761 which paid $43,935.76.

Based upon the factual determination that Garbage Service Company was the beneficiary of these policies, we applied the first sentence of Treasury Regulation § 20.-2042(c)(6), and held that the proceeds of these insurance policies were improperly included in the decedent's gross estate.

The Bank points out (which is undisputed by Mrs. Estes) that the beneficiaries of these two policies are not the corporation, but Mrs. Estes. From this factual posture, the Bank argues that Treasury Regulation § 20.2042(c)(6) requires that if any of the proceeds of the insurance policies are not paid to or for the benefit of the corporation "any incidents of ownership held by the corporation as to that part of the proceeds will be attributed to the decedent through his stock ownership where the decedent is the sole or controlling stockholder."

We admit our factual error as to the beneficiaries of these two policies and therefore our legal analysis set forth in our prior opinion is inapplicable.

Since Mrs. Estes is, in fact, the beneficiary of the two corporate policies and since Mr. Estes was the sole stockholder of the corporation, the following portion of Treasury Regulation § 20.2042(c)(6) is applicable:

[I]f the decedent is the controlling stockholder in a corporation, and the corporation owns a life insurance policy on his life, the proceeds of which are payable to the decedent's spouse, the incidents of ownerships held by the corporation will be attributed to the decedent through his stock ownership and the proceeds will be included in his gross estate under section 2042.

Mrs. Estes argues that since we held in our prior opinion that other insurance policies on Mr. Estes' life were improperly included within his gross estate, the same

reasoning would apply to the corporate policies. We disagree.

Our prior opinion held that Mr. Estes' ownership of policies owned by him on his own life had been divested by reason of a property settlement agreement entered into between Mr. and Mrs. Estes at the time of their divorce. By this divesture, Mr. Estes retained no incidents of ownership in these policies and therefore the proceeds of the policies should not have been included in the gross estate for tax purposes.

However, there is nothing in the property settlement agreement which would indicate that the divesture provisions of that agreement would affect life insurance policies owned by third parties. Thus, the reasoning of our prior opinion as to life insurance policies owned by Mr. Estes is not applicable to policies owned by the corporation.

We therefore modify our prior opinion by holding that the two Garbage Service Company policies in question were properly included in the decedent's gross estate for tax purposes and that the trial court properly disallowed surcharges against the executor for taxes paid as a result of that inclusion.

The Bank's motion for rehearing has also called into question our holding concerning the denial of executor's fees in this matter. We decline to reconsider the position taken on this issue in our prior opinion.

Mrs. Estes' motion for rehearing attacks our prior holding that the bank should not be surcharged for failure to account for assets of Garbage Service Company. We decline to reconsider this issue.

We hereby modify our prior opinion in the manner heretofore set forth and upon such modification, the motions for rehearing by both the Bank and Mrs. Estes are denied.

YALE McFATE and R. PORTER MURRY, Judges (retired), concur.

*Note:* The Honorable YALE McFATE and the Honorable R. PORTER MURRY, retired judges of courts of record, were authorized to participate in this matter by the Chief Justice of the Arizona Supreme Court pursuant to Arizona Const. art. VI, § 20.