**CHISHOLM et al. v. HOUSE et al.**

No. 3996.

United States Court of Appeals
Tenth Circuit.

July 26, 1950.

Creekmore Wallace, Oklahoma City, Okl., and H. B. Parris, Eufaula, Okl. (Roy White, Eufaula, Okl., was with them on the brief) for appellants.

Thomas M. Finney, Tulsa, Okl., (Villard Martin, Garrett Logan, Robert J. Stanton and Donald P. Moyers, all of Tulsa, Okl. were with him on the brief) for appellees.

Before PHILLIPS, Chief Judge, and BRATTON and MURRAH, Circuit Judges.

MURRAH, Circuit Judge.

This appeal is a sequel to Chisholm v. House, 10 Cir., 160 F.2d 632, and is related to Bradburn v. McIntosh, 10 Cir., 159 F.2d 925. It involves the correctness of the trial court's judgment in the proceedings in pursuance of our mandate in the Chisholm appeal.

The factual background and much of the pertinent facts are to be found in the former appeals. In resume, however, the suit was commenced in 1940, in the District Court of Muskogee County, Oklahoma, by the heirs at law of Cussehta Yarhola, a full-blood Creek Indian, alleging a conspiracy on the part of the named defendants to cheat and defraud Cussehta of his legal share of the proceeds of the productive allotments of his deceased wife, Linda, and deceased daughter, Maley Fiers. The purpose of the suit was to void a certain trust instrument executed in 1924 by Cussehta, on the grounds of incompetency; cancel releases and acquittals of the trustees; establish liability for maladministration, and secure an accounting for funds, securities and profits held by them during the administration of the estate under the purported trust agreement.

The United States intervened on behalf of the Indian heirs in support of their allegations, and removed the case to the Federal Court under Section 3 of the Act of April 12, 1926, 44 Stat. 239, 240. After removal, all of the plaintiffs adopted the Government's complaint in intervention, and the issues were joined thereon.

At the conclusion of the evidence for plaintiffs, the trial court dismissed the action and entered judgment for the defendants. We reversed holding the evidence sufficient to establish that defendants "House, Hill Moore and Grayson entered into a scheme to obtain control and management of Cussehta's estate, with the design and purpose of deriving improper personal advantage and gain therefrom;" that they and persons acting in their behalf, induced Cussehta to execute the original trust agreement and the instruments supplemental thereto, and place such estate under the control and management of Hill Moore, Grayson and House; that later, D. W. Johnston entered into such scheme; that House, Hill Moore, Grayson and D. W. Johnston fraudulently induced Cussehta to agree to pay, and did pay, unconscionable and exorbitant fees to the trustees, and fraudulently induced Cussehta to execute acceptances of reports by the trustees which

purported to discharge them and their sureties on their bonds from liabilities for the acts of the trustees; that the trustees made loans to Lake Moore, father of Hill Moore, which were not repaid, and failed to collect loans made by the trustees to D. W. Johnston; that the trustees made reports to Cussehta which were false and incomplete; that D. W. Johnston and Grayson made a report to Nancy and Lessey which was false and incomplete, and in so doing, the trustees violated their fiduciary obligations to Cussehta, Nancy and Lessey.

We accordingly concluded that the United States was entitled to an accounting from the trustees with respect to the interest in the allotments of Maley and Linda, which passed to Cussehta and later to Nancy and Lessey; that the other plaintiffs were entitled to an accounting with respect to the trust estate, and on an accounting, the court should scrutinize the administration of the trust estate by the trustees, should require the repayment by the trustees of the exorbitant and unconscionable fees charged by them, and determine their liabilities for the breaches of their duties and the maladministration of the trust estate. We further held the defendant Johnston liable to the plaintiffs, other than the United States, upon the loans made to him by the trustees which he failed to collect after he became trustee, and which he omitted from his final report to Nancy and Lessey. We voided House's contract with Cussehta for ten per cent of the value of his estate in the sum of $30,600.00 to have him restored to competency; held such fee exorbitant, unconscionable, and fraudulently obtained, and that the plaintiffs were entitled to recover the amount paid. We sustained the trial court's dismissal as to defendants McKinney, Randles, Chowning and the Okemah National Bank, holding the evidence insufficient to show that they had knowledge of the conspiracy or participated therein. We also sustained the trial court's dismissal as to the Shell Petroleum Company, the purchaser of the oil runs, on the grounds that the judgment of the County Court of Okfuskee County restoring Cussehta to competency not being void, the payment for the oil runs to the trustees under the trust agreement constituted a valid discharge of its liability.

We were unable to determine whether, from the evidence adduced, defendants Martin, Lake Moore and McKinney were liable on the bound of trustees Hill Moore and Grayson. We accordingly vacated the judgment of dismissal as to them. We reversed as to the other defendants, and remanded the case with directions to proceed in conformity with our opinion.

In its order on the mandate, the trial court ordered the defendants Johnston and Grayson to file their accounts as trustees within sixty days, and that the defendant Martin, within the same time, cause to be filed for Hill Moore, deceased, and Grayson, or in his own behalf for them, an accounting for the period during which he was surety on their bond. The accounting was ordered without prejudice of the right of the defendants or any of them to raise appropriate defenses not inconsistent with the opinion and mandate of this court.

Before the case was tried, the defendant Johnston paid plaintiffs the sum of $15,-000.00 in settlement of all claims against him, and the case was dismissed as to him, without prejudice however to the plaintiff's right of action against the remaining defendants. Grayson is an old insolvent Indian. He made only nominal defense in the former trial and did not personally respond or appear in these proceedings. Hill Moore died before this suit was commenced, and his estate was never made a party. His father, Lake Moore, died after the commencement of this suit, and it was never revived against his representatives. McKinney is judgment proof and unconcerned. The Government did not participate further after remand, and is no longer actively interested.

We exonerated Martin of any participation in the fraudulent scheme in the former appeal. The trial court has again found him innocent of any active participation or guilty knowledge of any fraudulent scheme, and we agree. The primary issue on this appeal is Martin's liability as a surety for Hill Moore and Washington Grayson from April 15, 1925 until December 19, 1929,

when Hill Moore resigned and D. W. Johnston succeeded him as co-trustee. By the terms of the surety bond, Martin and the other sureties guaranteed the faithful performance of the trust, and by separate writing, Martin assumed joint control of the estate, with power to disapprove any transaction of the trustees. The basis of Martin's liability then is as surety for the trustees with power of joint control.

The assets of the trust estate in the custody of trustees Moore and Grayson, when Martin became surety with joint control on April 15, 1925, consisted of $2,899.63 cash, Cussehta's interest in the allotments of his wife Linda, and his daughter Maley, and eighty-three notes and mortgages, bearing eight per cent interest, with a face value of $281,500.00 The notes and mortgages represented loans on real estate in the Town of Okemah and the County of Okfuskee, Oklahoma, made by Cussehta's guardian before the creation of the trust estate in 1924, and by his trustees before Martin became surety.

During the period of Martin's suretyship, the trustees continued to collect the interest on the outstanding loans and reinvest the trust funds in real estate mortgages in Okemah and Okfuskee County.

In pursuance of the order of the court, Martin filed an accounting for the period of his suretyship. Exceptions were taken, an amendment was filed, and after further exceptions, another amendment was filed. Thereafter, upon a hearing on the plaintiff's exceptions, Martin testified from memory and records available to him concerning each and every transaction of the trustees while he was surety on their bond, and exercising joint control. From this evidence, the trial court scrutinized the nature and circumstances of each and every challenged transaction; if a loan, the value of the security at the time it was made and all other circumstances bearing upon the prudent and faithful administration of the trust estate.

The court found no fraud or conspiracy on the part of the trustees Hill Moore or Grayson, or any of the defendants, in the administration of the estate during Martin's suretyship. That is to say, that during this time, the trustees accounted for all of the assets coming into their hands or acquired by them, and delivered the same to their successor trustees; and that there was no evidence of misappropriations, "secret commissions" or "kickbacks."

Appellants invoke our general finding of a fraudulent scheme or conspiracy in the former appeal, and assert that no countervaling evidence was introduced in the subsequent hearings. They contend, therefore, that the defendants House, Moore, Grayson and Johnston stand guilty of a scheme to cheat and defraud Cussehta, and that it remains only for the court to enter judgment on the mandate against the trustees and their surety for the amount of the trustee and attorney fees paid during the trusteeship, as well as the exorbitant fees paid to House prior thereto.

We haven't any doubt that a scheme to cheat and defraud the Yarhola family was devised by House and his associates before the creation of the trust estate, and that it continued in one form or another throughout the existence of the trust, and even after its dissolution. But the existence of the fraudulent scheme does not necessarily mean that every act or transaction of any of the defendants was in furtherance of that plan or scheme, or was within itself actionably fraudulent. Fraud in the air, so to speak, is not actionable. It is the operative effect of the fraud that gives rise to the cause of action and conditions the extent of recovery.

Under the mandate of the court, the duty rested upon the trustees to account, and the burden was upon them or their sureties to establish the correctness thereof; to disclose fully and fairly the nature of each and every challenged transaction, and to satisfy the court that the administration of the trust was in accordance with the provisions of the trust instrument and the honor and integrity of a fiduciary. Neel v. Barnard, Cal.App., 143 P.2d 513; Neel v. Barnard, 24 Cal.2d 406, 150 P.2d 177; Davidson v. Young, 290 Mich. 266, 287 N. W. 459; Purdy v. Johnson, 174 Cal. 521, 163

P. 893; Garrett v. First Nat'l Bank & Trust Co., 5 Cir., 153 F.2d 289.

■ In judging the conduct of the trustees, we must keep in mind that Cussehta could neither read nor speak the English language, and that he imposed trust and confidence in the trustees and those who influenced him to execute the trust, and designate Hill Moore and Grayson as trustees to administer his estate for him. We must also not forget that in the administration of the estate, and a rendition of their accounts, the trustees owed this old simple minded unsuspecting Indian a standard of conduct "stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive * * *" was the standard for their behavior. Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545, 546, 62 A.L.R. 1; see also Wootten v. Wootten, 10 Cir., 151 F.2d 147; Id., 10 Cir., 159 F.2d 567.

The trustees made loans to Lake Moore, father of Hill Moore and co-surety, and to their attorneys and other parties prominently identified with Cussehta's affairs, all with Martin's approval. After carefully scrutinizing these particular loans, the court held that they were neither fraudulently nor imprudently made.

Two loans to Lake Moore were paid in full from the proceeds of the so-called Owens note and mortgage, which the trustees bought from him, and which the trial court found from the evidence was well secured and delivered to the successor trustees, who arbitrarily compromised it at a loss to the estate. In that connection, the court specifically found that O. O. Owens, the endorser of his brother's note, was at all times financially able to pay the note when due. The court further found that the other loans to Lake Moore, or to the attorneys for the trustees, were prudently made; that either the mortgages or deeds to the mortgaged properties were delivered to the successor trustees, and by them delivered to the heirs of Cussehta upon the termination of the trust.

■ With commendable care, the trial court took up and separately considered each loan to determine whether or not it was prudently made, and if not, whether the estate had suffered a loss as a result of such imprudency. It found and concluded that most of the challenged loans on the real estate were prudently made, and absolved the trustees and surety from liability thereon. Its analysis and conclusions on these transactions are not clearly erroneous, and they must stand.

■ The court found that the fees paid to the trustees Moore and Grayson during Martin's suretyship, although in accordance with the express provisions of the trust, were unreasonable and disproportionate. Since trustee Grayson offered no evidence of the value of his services, he was surcharged for the full amount received under the trust instrument during the period in question and while he acted as co-trustee with D. W. Johnston. But since the fees were paid in accordance with the express provisions of the trust, Martin was rightly held not liable as surety for the performance of its provisions.

■ One of the challenged items, shown on the semiannual reports of the trustees, was a special allowance to Cussehta in the sum of $5,000.00. On the accounting, Martin's itemized statement and explanation showed that $3,000.00 of this sum was paid to Sid White, attorney for the trustee, for services rendered in resisting a proceedings in the County Court of Okfuskee County to have Cussehta adjudged incompetent. The other $2,000.00 represented expenses incident to the litigation. The court correctly reasoned that since these funds were expended at Cussehta's request, and were expressly authorized and ratified by him, they were not improper, and neither the trustees nor their surety should be surcharged therefor.

■ Some of the loans were found to have been imprudently made. One of them, in the sum of $15,000.00, was made to D. W. Johnston (later trustee). Martin explained that Johnston was a banker at Weleetka who had borrowed money from his bank in Okemah on his open note, and that this particular loan was secured by bank stock having a reasonable value of $7,500.00, and stock in a lumber company,

the value of which Martin was unable to testify. Johnston paid the interest on the note during Martin's liability, and Moore and Grayson delivered the note and stock to their successor Johnston and Grayson in December of 1929. Cussehta agreed with Johnston to cancel the note as a condition to Johnston's becoming Moore's successor trustee, and the loan was thus cancelled without any attempt being made on the part of the successor trustees to realize on the note and mortgage. The court concluded that the loan to Johnston was imprudent because not adequately secured, but that the proximate cause of the loss was the failure of the successor trustees, Johnston and Grayson, to collect the note from Johnston, instead of cancelling it. The court surcharged Grayson for the amount of the note with interest at 8 per cent, but exonerated Martin on the grounds that the initial imprudence was not the proximate cause of the loss to the estate.

As to other loans found to have been imprudently made, the court was of the opinion that the loss to the estate, if any, was either not the proximate result of the imprudence, or it was unable to determine whether any loss had been eventually sustained after tracing the notes and mortgages, or the deeds to the mortgaged properties, to the successor trustees, and ultimately to Cussehta's heirs upon termination of the trust.

We think we must accept the court's conclusions with respect to these items as not clearly erroneous.

The court found that the Pemberton loan was imprudently made, resulting in an eventual loss to the estate in the amount of $2,476.92. It also found that the so-called Lud King loan was an imprudent transaction, resulting in a loss to the estate in the sum of $476.00.

During the period of Martin's suretyship, the trust instrument provided for the payment of reasonable attorney fees for the trustees, not to exceed $3,000.00 per year. The attorneys were, however, paid the full $3,000.00 per year for all this period. The trial court found that any fees paid to the attorneys in excess of $100.00 per month were unreasonably excessive.

The court surcharged the trustee Grayson with the amount of the losses in the Pemberton and King loans and for the excessive attorney fees, but it held the claim against the surety for these items barred by limitations and laches. We accept the trial court's analysis and conclusions on the accounting; that is, whether in each case the transaction was fraudulent, prudent or imprudent, and if imprudent, the consequent loss to the estate.

Although the court did not specifically hold limitations or laches inapplicable to bar the claim against Grayson, a holding to that effect is, we think, implicit in its judgment of liability. But in any event, we do not think limitations or laches admissible to bar plaintiffs' claim against the trustees.

"The beneficiary cannot hold the trustee liable for a breach of trust if he fails to sue the trustee for the breach of trust for so long a time and under such circumstances that it would be inequitable to permit him to hold the trustee liable." Restatement Trusts, Sec. 219. And where, as here, the action is commenced after the lapse of the applicable statute of limitations, the burden is upon the plaintiffs to allege and prove that the fraud was not discovered until within the statutory period before the commencement of the action. Pepper v. Truitt, 10 Cir., 158 F.2d 246; Gulf Coast Western Oil Co. v. Trapp, 10 Cir., 174 F.2d 339. Concealed fraud was the gravamen of the plaintiffs' suit. It was in issue, tried and decided in the case. "The question of whether a claim is barred by laches must be determined by the facts and circumstances in each case, and according to right and justice. Laches in legal significance is not merely delay, but delay that works a disadvantage to another." Stallings v. White, 194 Okl. 649, 153 P.2d 813, 817.

And, "Laches will not be imputed to one who has been justifiably ignorant of the facts creating his right or cause of action, and who, therefore, has failed to

assert it." Alexander v. Phillips Petr. Co., 10 Cir., 130 F.2d 593, 606. See also Phelan v. Roberts, 182 Okl. 202, 77 P.2d 9; Lawson v. Haynes, 10 Cir., 170 F.2d 741. "One cannot acquiesce in the performance of an act of which he is ignorant." Pomeroy's Equity Juris., 4th Ed., Vol. 4, Sec. 1447. Equity does not bar a claim of this kind unless it is inequitable not to do so. Oldland v. Gray, 10 Cir., 179 F.2d 408. Thus, "The beneficiary will not ordinarily be barred by laches from holding the trustee liable for a breach of trust of which the beneficiary did not know, and had no reason to know." Restatement Trusts, Sec. 219, Comment c.

Appellees insist that the action is governed by the Oklahoma two or five year statutes of limitation as one arising out of a surety contract, citing Foster v. Walker, Okl., 217 P.2d 533, to the effect that statutes of limitation apply equally to actions at law and suits in equity. We do not understand that by this pronouncement the Oklahoma court intended to repudiate the rule so well rooted in its jurisprudence to the effect that actions cognizable in equity are governed by equitable considerations. Wilhelm v. Pfinning, 191 Okl. 321, 129 P.2d 580; Harrison v. Eaves, 191 Okl. 453, 130 P. 2d 841; Dunavant v. Evans, 191 Okl. 208, 127 P.2d 190; Hester v. Watts, Okl., 218 P. 2d 641. But even so, neither the statute of limitations nor laches operate to bar a claim based upon undiscovered fraud or fraud of which the plaintiff was justifiably ignorant. Bailey v. Glover, 21 Wall. 342, 88 U.S. 342, 22 L.Ed. 636; McMullen v. Wilfield Building and Loan Ass'n, 64 Kan. 298, 67 P. 892.

In determining whether Cussehta or his heirs were justifiably ignorant of the default of the trustees, it is relevant to consider his powers of understanding and comprehension in respect to the administration of the trust affairs, as well as the degree of trust and confidence imposed in the trustees and those who influenced their administration of the trust. True, as the trial court observed, Cussehta was legally competent, and for that matter, competent in fact, when he executed the trust agreement and approved the semiannual accounts of the trustees and executed releases and acquittals on which the parties rely. But, it is also true, as we observed in the former appeal, that "a competent person may be defrauded." A release or contract is not effective to discharge the trustee's liability for a breach of trust if inter alia "the beneficiary did not know of his rights and of the material facts which the trustee knew or should have known and which the trustee did not reasonably believe that the beneficiary knew." Restatement Trusts, Sec. 217.

In 1917, when Cussehta was fifty-five years of age, he was declared incompetent as an illiterate Indian who did not realize the value of his estate, and as a person who was easily overreached by those whom he trusted. In 1923, he paid $10,000 to avoid being declared competent. In 1924, he paid $30,000.00 to be adjudged competent. Some of the same persons who testified to his incompetency in 1917, testified that he was competent in 1924. As an Indian who could neither read nor speak the English language, he knew and understood only what was explained to him through an interpreter, and even then it is manifest on this record that he had little or no knowledge or understanding of his affairs, or the manner in which they were being administered. We have held the acts and contracts of Indians of weak understanding void where facts justify the conclusion that the party has not exercised deliberate judgment, but has been imposed upon or unduly influenced, although the Indian may have been legally and factually competent. Whitchurch v. Crawford, 10 Cir., 92 F.2d 249; Lawson v. Haynes, 10 Cir., 170 F.2d 741.

We have said that although this trust agreement was not void as against innocent third parties, it was fraudulently induced and voidable as to those parties who had knowledge of or participated in the fraud, including the trustees Hill Moore and Washington Grayson. It is clear beyond dispute that Cussehta had implicit confidence in his trustees, and believed without question every representation made to him. He continued under their influence and domination until his death in 1936. Hill Moore resigned in 1929, and Martin was discharged on the bond, but successor trus-

tees continued to control and manage the property under the trust agreement until after Cussehta's death in 1936. In 1937, the parties sought to terminate the trust and exonerate themselves by judicial decree of the District Court of Okfuskee County, but we held this judgment void and ineffectual for extrinsic fraud. Chisholm v. House, supra, 160 F.2d at page 643.

Before the trust was terminated in 1937, the estate was restored to the control of House as attorney-in-fact for plaintiffs Lessey and Nancy as the heirs at law of Cussehta. Thus, the trust was conceived, born, lived and died in fraud. From the whole record, we are convinced that Cussehta never understood the nature of his acts or contracts or their legal import. He was justifiably ignorant of the default of the trustees, and limitations or laches did not therefore run against him during his lifetime. It is not clear when House relinquished management and control of the estate and the affairs of Lessey and Nancy, but it was after 1937, and this suit was commenced in 1940.

The record also shows conclusively that Lessey and Nancy were illiterate and incapable of understanding the nature and consequences of their acts. They had been alternately declared incompetent and competent, as suited the purposes of those who were managing their affairs, for their selfish benefit. They were always under the domination of the same parties who administered Cussehta's trust and affairs, and the administration of their estates followed the same pattern. We are certain that they were also justifiably ignorant of the default of Cussehta's trustees, and that their claims as his heirs are not barred by limitations or laches.

The question remains whether Martin as surety for the defaulting trustees can invoke limitations or laches when they are unavailable to his principal.

■ The liability of the trustees arises out of the trust agreement, and is based upon the faithful performance of the trust. The liability of Martin as surety arises by contract, and is governed by its terms and conditions. Its terms are to be interpreted by the same rules observed in other contracts. Title 15 O.S.A. 374. Dolese Bros. Co. v. Chaney & Rickard, 44 Okl. 745, 145 P. 1119. But, having guaranteed the faithful performance of the trust, Martin's liability as surety is measured precisely by the liability of the trustee— whatever discharges the trustee discharges Martin. Anderson v. Shaffer, 98 Cal.App. 457, 277 P. 185; Eising v. Andrews, 66 Conn. 58, 33 A. 585, 50 Am.St.Rep. 75. And, conversely, whatever binds the trustees binds Martin, for as surety he can make no defense which the trustees waived, or by their conduct precluded themselves from making. Commercial Casualty Ins. Co. v. Breckenridge, 128 Okl. 215, 262 P. 208; M. S. Cohn Gravel Co. v. Southern Surety Co., 129 Okl. 171, 264 P. 206; 50 Amer.Juris. Suretyship, Sec. 30, p. 921. Any act of the principal which estops him from setting up a defense personal to himself, operates equally against his surety. Boone County v. Jones, 54 Iowa 699, 2 N.W. 987, 995, 37 Am.Rep. 229; 50 Amer.Juris.Suretyship, Sec. 140.

■ Thus, where the trustees' concealment of their default, or the justifiable ignorance of Cussehta and his heirs, prevents the running of the statute of limitations or laches as against them, they do not run against Martin as surety, even though he was innocent of any fraud or concealment. The rationale is that "so long as the original duty of the principal continues, the liability of the surety persists," especially where, as here, the "relations of the principal and surety are such that the surety is in a better position than the creditor to know the facts regarding the principal's performance of his duty." Restatement Security, Sec. 121, Comment a; see also 50 Amer. Juris.Suretyship, Sec. 184, p. 1023. We conclude that limitations or laches not being available to the trustees, they are not available to Martin.

But Martin took a separate and independent release from Cussehta on December 23, 1929, four days after Hill Moore resigned as trustee and Martin was discharged as a surety on the bond. The release was prepared by an attorney wholly unconnected with the administration of the trust. It re-

cited the execution of the original and supplemental trust instruments, and the surety bond for its faithful performance; the rendition of a complete written inventory and accounting disclosing the condition of the estate, and the manner of its administration. It also significantly recited examination and verification by Cussehta. The instrument, by its terms, fully, finally and completely discharged and acquitted the trustees and their sureties from "any and all responsibility or liability of any kind whatever because of the administration of the trust estate" to that date by reason of the execution of the bond, or of the delivery of the assets under the agreement. The report and inventory were attached. Cussehta signed by his thumb print before witnesses who swore that they had translated and interpreted the release to Cussehta in the Creek language, and that he fully understood the same and the effect thereof. The trial court observed, and it was conceded at the trial, that the release was without consideration. And see 50 Amer.Juris.Suretyship, Sec. 101. Since, however, the trial court disposed of the case on laches, it had no occasion to consider Martin's equitable plea of estoppel.

Martin contends that since the execution of that release, he has relied upon it and has changed his position to his detriment. He points out that since its execution, one of the trustees has died, and the other has become insolvent after having received large sums of money as trustee of the estate after Martin's discharge on the bond; that the records have been lost, his memory dimmed with age, and that Cussehta or his heirs were therefore estopped from denying the validity of the release.

Although concededly Martin did not fraudulently induce Cussehta to execute the release, it is clear that he was as ignorant of its nature and legal consequences as any other instrument he executed while under the influence of his defrauders. As a banker having joint control of the estate, Martin had superior knowledge of the nature of the transactions held to be actionably imprudent, and for which he as surety would have been liable, in the absence of the release.

Estoppel, like laches, has its roots in equity, and is governed by equitable considerations. Dunavant v. Evans, 191 Okl. 208, 127 P.2d 190. One of the essential elements of estoppel is that the facts relied upon as a basis for estoppel must be known to the party estopped, or knowledge of them must necessarily be imputed to him. Another essential element is that the truth of these facts must be unknown to the one claiming the benefit of the estoppel. See Pomeroy's Equity Juris., Vol. 2, Sec. 805; 19 Amer.Juris.Estoppel, Sec. 34. It seems fair to say on this record that neither Cussehta nor his heirs had any knowledge of the basic facts, and that Martin did. We conclude that the basic elements of estoppel are lacking, and that Martin is therefore liable along with his trustees for the excessive attorney fees, and the loss sustained on the Pemberton and King loans, all as heretofore determined by the trial court.

In the former appeal, we held the $30,-600.00 fees paid to House in 1924 for securing Cussehta's restoration to competency exorbitant, unconscionable and fraudulently obtained, in violation of the confidence imposed in him by Cussehta, and that Cussehta was entitled to recover the same. On remand, the trial court construed our mandate on the opinion as leaving a discretion in the trial court to award House reasonable compensation on quantum meruit. It accordingly fixed a reasonable fee of $2,600.00, and entered judgment against House for the sum of $28,000.00, with interest from the date of the judgment.

It is plain from the record, we think, that the services rendered by House, and for which compensation was paid, were in furtherance of his scheme to cheat and defraud Cussehta, and were therefore in furtherance of his own self interest. We can find no legal or equitable justification for compensating him for such services.

In its judgment against House and the trustees for their default, the court allowed interest at the rate of six per cent per annum from the date of the judgment. Appellants complain of the failure of the court to allow interest from the date of the default.

We have recently said, following Oklahoma law, that as a general rule, interest on an unliquidated amount or claim is not recoverable until the amount due is fixed by judgment. Robberson Steel Co. v. Harrell, 10 Cir., 177 F.2d 12, 17. But this rule has application to actions in law. "Where a trustee commits a breach of trust and becomes liable for a sum of money, he is ordinarily liable for interest thereon." Scott on Trusts, Vol. 2, Sec. 207; see also Amer.Juris Interest, Sec. 27, p. 21. But, in the last analysis, whether interest will be allowed and the rate thereof, is "wholly in the discretion of the court." 4 Bogert on Trusts and Trustees (Part 1), p. 418; see also Greenberg v. Paramount Pictures, 2 Cir., 85 F.2d 42, 106 A.L.R. 1116; 47 C.J.S.Interest, § 3, p. 13.

In view of the lapse of time from the default until the assertion of the remedy, we think the allowance of the legal rate of interest from the date of the court's judgment was equitable and just.

The cause is reversed and remanded with directions to enter judgment in favor of the plaintiffs, and against Martin for the excessive attorney fees, and the loss shown to have been sustained on the Pemberton and King loans, with interest at the rate of six per cent from the date of the judgment against the trustees; and against House in the sum of $30,600.00, with interest at the rate of six per cent from the date of the judgment against him. In all other respects, the judgment is affirmed. The costs herein shall be assessed equally between the parties.