UNITED STATES of America

v.

John J. SHEA, a/k/a "Red," John K. Mackie, and George E. Hogan, Defendants.

Crim. No. 90–10204–K.

United States District Court, D. Massachusetts.

Oct. 10, 1990.

er defendants with engaging in a conspiracy to traffic in cocaine. Defendant Shea further was charged in a second indictment (CR No. 90–10203–Wd) involving 18 other defendants with conspiring to traffic in cocaine.

On August 10, 1990, when defendants first appeared before the Magistrate in this case, the government moved for pretrial detention with regard to all three defendants. After holding detention hearings on August 15, 1990, Magistrate Bowler ordered each of the defendants detained.

Now before the court are defendant Shea's Motion for Revocation or Amendment of Magistrate's Detention Order (Docket No. 91, filed August 27, 1990); defendant Mackie's Motion For Review of Detention Order, to Revoke or Amend Said Order to Allow His Release on Conditions (Docket No. 93, filed September 4, 1990), with supporting memoranda (Docket Nos. 94, filed September 4, 1990, and 212, filed September 12, 1990); defendant Hogan's Motion for Revocation of Order on Detention, with supporting memorandum (Docket Nos. 209 and 210, filed September 11, 1990) and Motion in Support of Reconsideration of Detention Order (Docket No. 157, filed September 19, 1990); Government's Memorandum of Law in Support of Pretrial Detention regarding all three defendants (Docket No. 158, filed September 19, 1990); and oppositions to the Government's Memorandum by defendants Shea (Docket No. 165, filed September 21, 1990), Mackie (Docket No. 164, filed September 21, 1990), and Hogan (Docket No. 211, filed September 21, 1990).

Martin F. Healey, Boston, Mass., for U.S.

Alfred E. Nugent, Boston, Mass., John C. Doherty, Jr., Andover, Mass., Frank A. Mickelson, Boston, Mass., for John K. Mackie.

Patrick J. Murphy, Boston, Mass., for George Hogan.

## MEMORANDUM AND ORDER

KEETON, District Judge.

On August 9, 1990, a federal grand jury returned four indictments, charging a total of 51 individuals with cocaine trafficking and related charges. Defendants John J. Shea, a/k/a "Red," John K. Mackie and George E. Hogan ("defendants") were each charged in one indictment involving 20 oth-

## I. BACKGROUND

Defendant Shea is charged in a total of 43 counts in two indictments (41 counts in this case and two counts in 90–10203–WD). The charges include operation of a continuing criminal enterprise (21 U.S.C. § 848), conspiracy to distribute cocaine (21 U.S.C. § 846), cocaine distribution (21 U.S.C. § 841(a)(1)), use or possession of a firearm in relation to a drug trafficking crime (18 U.S.C. § 924(c)), use of a telephone to facilitate a drug trafficking crime (21 U.S.C.

§ 843(b)) and interstate travel in aid of racketeering (18 U.S.C. § 1952). Defendant Mackie is charged in one indictment with a total of 40 counts, including operation of a continuing criminal enterprise, conspiracy to distribute cocaine, cocaine distribution, using a telephone to facilitate a drug trafficking crime, and use or possession of a firearm in relation to a drug trafficking crime. (See above for statutory citations.) Defendant Hogan is charged in one indictment with a total of two counts. These include conspiracy to distribute cocaine and use of a telephone to facilitate a drug trafficking crime. (See above for statutory citations.)

## II. LEGAL STANDARD FOR DETENTION

The Bail Reform Act prescribes the standard a judicial officer shall apply at a detention hearing in specified cases that include:

> upon motion of the attorney for the Government in a case that involves—
>
> . . . . .
>
> (c) an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act (21 U.S.C. § 801 et seq.)....

18 U.S.C. § 3142(f)(1). The statutory definition of the standard is stated in the following way:

> The judicial officer shall hold a hearing to determine whether any condition or combination of conditions set forth in subsection (c) of this section *will reasonably assure the appearance of the person as required and the safety of any other person and the community....*

18 U.S.C. § 3142(f) (emphasis added). An order of detention is appropriate only if the judicial officer determines that this standard is satisfied. Stated another way, then, such an order is appropriate only if detention is required to reasonably assure (1) the appearance of the defendant ("appearance"), and (2) the safety of one or more identified persons other than the defendant, and the safety of the community ("safety"). For convenience, I will sometimes refer to these requirements in this Memorandum as the requirements regarding "appearance" and "safety." Because the statutory connective is "and," detention may be ordered if essential either to appearance or to safety.

Congress also prescribed a list of factors to be considered:

> The judicial officer shall, in determining whether there are conditions of release that will reasonably assure the *appearance* of the person as required and the *safety* of any other person and the community, take into account the available information concerning—
>
> (1) The nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug;
>
> (2) The weight of the evidence against the person;
>
> (3) the history and characteristics of the person, including—
>
> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>
> (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
>
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release....

18 U.S.C. § 3142(g) (emphasis added).

Because the text introducing this list of factors refers both to reasonably assuring *appearance* and to reasonably assuring *safety,* there is an inherent ambiguity as to whether each factor listed is declared to be relevant to both *appearance* and *safety.* In whatever way this ambiguity may be resolved if the need should arise (and I conclude it does not arise in this case),

some of these factors by their nature weigh more heavily on appearance than on safety and vice versa. For example, evidence of "community ties" has substantial weight in relation to reasonably assuring appearance and much less weight in relation to reasonably assuring safety. *Cf.* Legislative history of Bail Reform Act of 1984, S.Rep. No. 225, 98th Cong., 2d Sess. 24, *reprinted in* 1984 U.S.Code Cong. & Admin.News 3182, 3207.

In addition to the factors listed in § 3142(g), the judicial officer is directed to take account of a rebuttable presumption that is relevant to the present case. 18 U.S.C. § 3142(e). The effect of that presumption is examined more closely in Part V of this Memorandum, *infra.* The presumption merely creates a burden of *production* on the defendant, however; it does not shift the burden of persuasion, which remains throughout the hearing on the government. *United States v. Jessup,* 757 F.2d 378, 381–82 (1st Cir.1985). *See also United States v. O'Brien,* 895 F.2d 810, 815 (1st Cir.1990).

The definition of the government's burden is stated in the statute. A judicial officer's determination that "no condition or combination of conditions [of release] will reasonably assure the *safety* of any other person and the community shall be supported by *clear and convincing evidence.*" 18 U.S.C. § 3142(f) (emphasis added).

### III. DETENTION GROUNDED ON SAFETY

In the present case, the government's position that each of the defendants should be detained is grounded solely on reasonably assuring safety. The government based its motion for detention on the fact that defendants were accused of committing offenses for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act. *See* 18 U.S.C. § 3142(f)(1)(C). After holding detention hearings on August 15, 1990, Magistrate Bowler concluded that the government had established by clear and convincing evidence with regard to all

three defendants that no condition or combination of conditions set forth under 18 U.S.C. § 3142(b) or (c) would reasonably assure safety.

After defendants filed papers for review of the detention orders, this court held a hearing on September 12, 1990. In their motions and at the hearing, defendants presented additional evidence not available to Magistrate Bowler when she made her decision. At the court's request, additional memoranda were filed to address issues concerning the meaning of "danger to the community" as used in the statute in relation to a drug case.

### IV. STANDARD OF REVIEW

■ The prescription for "review" as it appears in the Bail Reform statute, 18 U.S.C. § 3145(a) and (b), requires the court to apply a standard of review that falls somewhere between using a "clearly erroneous" standard and holding a *de novo* hearing. *Cf. United States v. O'Brien,* 895 F.2d at 812–814. *See also United States v. King,* 849 F.2d 485, 490 (11th Cir.1988) (describing district court's function as conducting "an independent review to determine whether the magistrate properly found that pretrial detention is necessary"); *United States v. Phillips,* 732 F.Supp. 255, 258–259 (D.Mass.1990).

The findings stated in this Memorandum are based on all the evidence before me, including both that presented to the Magistrate and the evidence received at the hearing of September 12, 1990 in this court.

### V. PRESUMPTIONS AND BURDENS IN DRUG CASES

A. *Unique Treatment of Specified Drug Offenses*

Drug charges of which defendants have been accused carry a maximum term of imprisonment of ten years or more under the Controlled Substances Act.

In the legislative history of the Bail Reform Act, the Committee offers a partial explanation of the Act's unique treatment of persons accused of such offenses:

It is well known that drug trafficking is carried on to an unusual degree by persons engaged in continuing patterns of criminal activity. Persons charged with major drug felonies are often in the business of importing and distributing dangerous drugs, and thus, because of the nature of the criminal activity with which they are charged, they pose a significant risk of pretrial recidivism.

S.Rep. No. 225, 98th Cong., 2d Sess. 20, *reprinted in* 1984 U.S.Code Cong. & Admin.News 3182, 3203.

The quoted passage is the most explicit in the legislative history regarding what has come to be referred to as a "congressional paradigm," *cf. Jessup*, 757 F.2d at 387, in relation to persons charged with major drug felonies. Elements of the paradigm are also implicit in the terms of the statute specifying those offenses that give rise to a presumption. *E.g.*, 18 U.S.C. § 3142(e).

## B. *The Statutory Presumption*

■ The return of an indictment "fair upon its face" charging the defendant with a drug offense of the prescribed severity establishes probable cause. *United States v. Vargas*, 804 F.2d 157, 163 (1st Cir.1986). This determination of probable cause creates a statutory presumption that no condition or combination of conditions will reasonably assure safety. 18 U.S.C. § 3142(e).

■ Faced with this presumption, a defendant has a burden of production. *Jessup*, 757 F.2d at 381–384. Though the burden is only one of production, the presumption is not a "bursting bubble." *Id.* at 383; *see also United States v. Hare*, 873 F.2d 796, 799 (5th Cir.1989) (the statute creates "an unusual set of weights and measures in which the burden of persuasion is on the government, not the defendant, but the presumption may be weighed in the evidentiary balance").

A defendant confronted with such a presumption may meet his burden of production by "introduc[ing] some evidence to the contrary." *United States v. O'Brien*, 895 F.2d at 815, *citing Jessup*, 757 F.2d at 381. Because the matters at issue include "all

the special features of his [the defendant's] case," *Jessup* at 387, evidence bearing on any of those features is relevant. At the least, then, relevant evidence includes that relating to any of the factors listed in § 3142(g). *See, e.g., United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1986).

As the First Circuit noted in *Jessup*,

The less those features [of a defendant's case] resemble the congressional paradigm, the less weight the magistrate will likely give to Congress's concern for flight.

757 F.2d at 387.

In *Jessup*, the issue was reasonable assurance *against flight* (the converse of reasonable assurance *of appearance* ). I conclude, however, that the rulings in *Jessup* regarding the continuing effect of the presumption (after production of evidence by a defendant) apply with at least as great force, and perhaps with even more force, to the reasonable assurance of *safety*. This inference is supported by the fact that where a distinction has been drawn between proof as to safety and proof as to appearance, it concerns not the presumption but the burden of persuasion. The government's burden as to safety is proof by clear and convincing evidence. *See* Part II, *supra*. Its burden as to appearance is proof by a preponderance of the evidence. *See, e.g., United States v. Vortis*, 785 F.2d 327, 328 (D.C.Cir.1986), *cert. denied Vortis v. United States*, 479 U.S. 841, 107 S.Ct. 148, 93 L.Ed.2d 89 (1986); *United States v. Himler*, 797 F.2d 156, 161 (3d Cir.1986) (listing decisions by other Circuits that require a preponderance of the evidence to demonstrate risk of flight).

*Jessup* gave an additional explanation about weight of the presumption:

The individual characteristics of a case and the precise weight to be given the presumption are matters for a magistrate to take into account within the framework of factors set out in § 3142(g).

757 F.2d at 387.

■ In summary, then, with respect to safety, in order to conclude that detention

is necessary, a judicial officer must be convinced by clear and convincing evidence that no condition or combination of conditions will reasonably assure the safety of any other person(s) and the community. 18 U.S.C. § 3142(f). And, once a defendant satisfies his burden of production, the court must determine whether on all the evidence, and with due weight given to the presumption, the government has shown by clear and convincing evidence that detention is required to reasonably assure safety.

### C. *Safety and Danger*

Even though the ruling in *Jessup* regarding continuing effect of the presumption applies to *safety* as well as to *appearance,* an important difference between these two different contexts for applying the presumption comes from the different weight given to particular facts in each context. This point is confirmed by legislative history that suggests somewhat different paradigms for appearance and safety. Thus, in applying the presumption in this case, it is necessary to focus on the relation between the evidence proffered by the defendants and the congressional paradigm regarding safety.

In the foregoing explanation of the statutory presumption, I have used the term "safety" for shorthand, or a more precise phrase such as "reasonably assure safety." This or similar terminology appears at numerous places in the Bail Reform Act. *E.g.,* § 3142(b), (c), (e), (f), (g). The opposite of reasonable assurance of safety is danger. In some instances, the Bail Reform Act uses the term "danger." For example, it does so in enumerating the factors a judicial officer shall consider. 18 U.S.C. § 3142(g)(4) ("the nature and seriousness of the danger to any person or the community that would be posed by the person's release"). *See also* § 3142(d)(2); *cf.* § 3143(a), concerning release pending sentence.

The term "danger" invokes a concept of probability (commonly referred to as risk of harm) rather than certainty of harm. As used in the Bail Reform Act, "safety" is accompanied often by a phrase such as "reasonably assure." *E.g.,* § 3142(f)(1), (g). Thus, as used in the Bail Reform Act, "safety" also invokes a concept of probability rather than certainty.

The statutory presumption regarding safety (or danger) is

> designed to predict, albeit not completely reliably, the types of circumstances in which pretrial release of a defendant will be dangerous to the community.

*Phillips, supra,* 732 F.Supp. at 264. The pretrial detention decision in a particular defendant's case, however,

> must be focused on one individual—the defendant—and the court must view that defendant as an individual.

*Id.* In making the pretrial detention decision, a judicial officer must also consider an additional question of statutory meaning: What degree of risk, taking account of both severity of harms and probability of occurrence, is enough to constitute "danger" in the statutory sense?

The Bail Reform Act does not provide a specific, bright-line answer to this question. Instead, it prescribes a standard—"reasonably assure safety"—that requires the judicial officer to make an evaluative, judgmental determination. In using the word "danger" and phrases such as "reasonably assure safety,"

> Congress did not declare that the community is entitled to assurances of freedom from all harm, and a court cannot detain arrestees on the mere apprehension of danger of harm. Rather, the court's inquiry must focus on whether by conditions of release the community can *reasonably* be assured of safety.

*Id.* at 266. The judicial officer's principal sources of guidance for understanding this statutory standard are the congressional paradigms implicit in the presumptions regarding appearance and safety. They are explained as well in the legislative history, cited and partly quoted in Parts II and V.A., *supra.* As noted above, the relevant paradigm for this case is the paradigm regarding safety (or danger).

**1168**

## VI. APPLICATION OF THE LAW TO THE PRESENT CASE

### A. *Defendant Shea*

 In her Memorandum and Order dated August 23, 1990 (Docket No. 82) ("Shea Order"), Magistrate Bowler determined that detention of defendant Shea was required to reasonably assure safety. In reaching this determination, the Magistrate relied on the testimony of Detective Carr and tape recorded conversations indicating that defendant Shea "is a high ranking official in the drug trafficking organization which is the subject of this indictment." Shea Order at 13–14. She referred to defendant Shea's conversation with Jesus Nodarse as indicating defendant Shea's "serious involvement in drug trafficking." *Id.* at 14. She further alluded to the threatening and violent language used by defendant Shea on the tapes and defendant Shea's "threatening and intimidating behavior" regarding Detective Beers. *Id.*

The Magistrate also noted that a search of defendant Shea's residence in January, 1990 resulted in the recovery of an unlicensed firearm. She interpreted this as "another indication of a propensity to resort to violence." *Id.*

Noting that defendant Shea "does not have a criminal record of any significance," the Magistrate nevertheless found that he had introduced "little or no evidence" to weigh against the statutory presumption raised by the nature of the extensive charges and the serious penalties that they carry. Although she found that defendant Shea had "ties to the community," the Magistrate found that he was living with an individual named as a co-defendant at the time of his arrest. Finally, the Magistrate noted defendant Shea's "practically nonexistent" work history before the three months leading up to the indictment, as demonstrated by Detective Carr's surveillance of him for more than two years and defendant Shea's failure to file income tax returns. Shea Order at 14.

Nothing in the evidence before the Magistrate or in the evidence before this court leads to the conclusion that the Magistrate's decision to detain defendant Shea was incorrect. Having considered all the evidence independently, I reach the same conclusion.

Defendant Shea, it is true, by introducing evidence with regard to his not having a significant prior criminal record and his behavior while out on bond earlier this year, has met his burden, imposed by the statutory presumption, of producing some relevant evidence. Weighing all the evidence, however, I conclude that defendant Shea's case closely resembles the congressional paradigm regarding safety. Thus, the presumption mandated by Congress has great weight as to Shea's case.

Defendant Shea's lack of a significant prior record and his apparent good behavior while out on bond for assault charges (later dismissed) in January and February of this year weigh in his favor. This evidence is heavily outweighed, however, by other evidence and the significant weight of the presumption in this case. In summary, the government has established by clear and convincing evidence that no condition or combination of conditions will reasonably assure the safety of any other person and the community if defendant Shea were to be released.

In coming to this conclusion, I consider especially significant under § 3142(g)(1), (2) and (4) the nature and seriousness of the drug offenses with which he is charged, the weight of the evidence against him, and the nature and seriousness of the danger that his release would pose. I note, on the issues of seriousness, the evidence regarding defendant Shea's status as a high ranking official in the alleged drug trafficking organization at issue. Among the representations made by Detective Carr, I note the Detective's recollection of recorded statements made by Thomas Cahill, a co-defendant in the first of the indictments, describing defendant Shea as being in charge of the organization (Transcript of August 15, 1990 Detention Hearing, pp. 9–10); and a recorded conversation between defendant Shea and Paul Moore in which Moore described both his own and defendant Shea's respective responsibilities in the cocaine business. In the latter conversation, as

reported by Detective Carr, Moore described himself as the retailer and defendant Shea as the wholesaler (Transcript, p. 11).

■ At the initial detention hearing, defendant Shea's counsel objected to Detective Carr's testimony regarding the tapes. The objection was founded on 18 U.S.C. § 2518(9), which provides:

The contents of any wire, oral, or electronic communication intercepted pursuant to this chapter or evidence derived therefrom shall not be received in evidence or otherwise disclosed in any trial, hearing or other proceeding in a Federal or State court unless each party, not less than ten days before the trial, hearing, or proceeding, has been furnished with a copy of the court order, and accompanying application, under which the interception was authorized or approved. This ten-day period may be waived by the judge if he finds that it was not possible to furnish the party with the above information ten days before the trial, hearing, or proceeding and that the party will not be prejudiced by the delay in receiving such information.

Defendant Shea's counsel contended that he had not received "any of the documents in question" "prior to ten days before" their use at the initial detention hearing. I conclude that Detective Carr's testimony with regard to the recorded conversations properly may be considered in making a detention decision for several independent reasons. First, the rules concerning admissibility of evidence in criminal trials do not apply in a detention hearing under the Bail Reform Act. 18 U.S.C. § 3142(f). Second, the First Circuit has approved the use of investigatory descriptions of evidence at detention hearings where the judicial officer reasonably concluded that those descriptions were reliable. *United States v. Acevedo–Ramos*, 755 F.2d 203, 207–209 (1st Cir.1985). Third, as government counsel argued at the initial detention hearing, if the court were to adopt defense counsel's position, the government never could use tape recorded evidence at the initial detention hearing before a magistrate because

the 10–day rule would "swallow up" the three-day detention rule. Transcript, p. 5. Finally, defendant Shea certainly had notice for more than ten days before the second detention hearing in this court. Detective Carr's testimony is part of the evidence properly to be considered by this court at this time. This ruling, of course, is not a ruling as to the admissibility of evidence at trial.

Evidence of defendant Shea's leadership role is relevant in evaluating the nature of the charges, the weight of the evidence against defendant Shea, and the seriousness of the danger that his release would pose under 18 U.S.C. § 3142(g)(1), (2) and (4). *See, e.g., United States v. Zannino*, 798 F.2d 544, 547 (1st Cir.1986) ("Zannino played a continuing leadership role in mob activities ... directing illegal activities through communications with associates" even while detained in a hospital); *United States v. Accetturo*, 783 F.2d 382, 384 (3d Cir.1986) (Accetturo "headed" a "well-run criminal organization"); *United States v. Colombo*, 777 F.2d 96, 99 (2d Cir.1985) ("Colombo was the leader of an enterprise that carried out its criminal activities at his direction ... orchestrating a series of violent criminal operations").

A person who allegedly led a criminal enterprise involving cocaine distribution fits squarely within the congressional paradigm of a dangerous defendant accused of drug offenses. In *Colombo*, 777 F.2d at 99–100, the Second Circuit emphasized the defendant's leadership role and the danger that he might direct and supervise criminal activity while out on bail when it held that Colombo's release on conditions was clearly erroneous.

Counsel for defendant Shea cites *United States v. DiGiacomo*, 746 F.Supp. 1176 (D.Mass.1990), in support of defendant Shea's contention that he should be released with suitable conditions. In *DiGiacomo*, Judge Wolf determined that defendant DiGiacomo was entitled to be released on strict conditions, even though DiGiacomo was a "capo," or official with some supervisory capacity, in La Cosa Nostra, a crime organization. Although noting that

"leaders or individuals with the ability to direct the criminal activity of others pose a special threat to the safety of the community," *DiGiacomo* at 1182, Judge Wolf concluded that DiGiacomo should be released before trial. In part, his decision was based on a finding that DiGiacomo's primary dangerous illegal activity was loan-sharking, not drug dealing. *Id.* at 1188. DiGiacomo "was ambivalent, and perhaps hypocritical, with regard to being involved with narcotics." *Id.* Also, Judge Wolf found that "while DiGiacomo aided and abetted the narcotics activities of others, he did not personally deal drugs." *Id.*

Defendant Shea's case differs from that of DiGiacomo because defendant Shea has been tied directly to drug dealing activity by Detective Carr's testimony and other evidence. Defendant Shea, unlike DiGiacomo, has been characterized as a cocaine "wholesaler." Also unlike the defendant in *DiGiacomo,* defendant Shea personally has been indicted for possessing with the intent to distribute, and distributing, cocaine. More like the defendant in *Colombo,* defendant Shea fits the congressional paradigm of an unreasonable safety risk. As the government has pointed out, drug-related criminal activity could be directed from house arrest—for example, by use of a cellular telephone. Even if there were some way to put a pen register on a cellular telephone or if defendant Shea were barred from using a cellular telephone, these conditions would not satisfy congressional concern over the unreasonable risk of harm to other persons and the community that would be posed by defendant Shea's release. It simply is not possible to fashion and enforce conditions sufficient to reasonably assure that defendant Shea, the alleged leader of a sophisticated cocaine business, would be unable to give orders from his pre-trial home.

I note the complaints of counsel to defendant Shea and counsel to the other detained defendants in the instant proceeding with regard to their difficulty of obtaining access to the defendants at current pre-trial placements. I do not read the congressional concern over the dangerousness of cer-tain accused drug dealers, which is evident in the Bail Reform Act, as mandating disregard for a defendant's right to due process under the United States Constitution and to a speedy trial under the Speedy Trial Act (18 U.S.C. §§ 3152 *et seq.,* 3161 *et seq.;* 28 U.S.C. § 604). Should circumstances develop in which impairment of these guaranteed rights is occurring, evidence of that impairment may be brought to the court's attention by motion. Explicitly, I leave open for future determination, should the issue be presented, whether it is proper to weigh such evidence along with other evidence and the statutory presumption in determining whether the court finds by clear and convincing evidence that detention is required for safety.

## B. *Defendant Mackie*

In her Memorandum and Order dated August 24, 1990 (Docket No. 81) ("Mackie Order"), Magistrate Bowler determined that detention of defendant Mackie was required to reasonably assure safety. In arriving at this determination, the Magistrate relied on evidence offered by the government, through tape recorded conversations, that "strongly suggests that the defendant is a person prone to violence." Mackie Order at 12. Further, she relied on the testimony of Sgt. Dewan that listed several firearms found at defendant Mackie's premises, indicating that defendant Mackie had the means to act on his statements in the recorded conversations. *Id.* Also found at defendant Mackie's home was cocaine, a scale and "other drug paraphernalia," which the Magistrate described as "evidence that the defendant was engaged in drug trafficking." *Id.* The Magistrate finally noted that defendant Mackie had been charged with 32 counts to distribute cocaine, in violation of 21 U.S.C. § 843, and gave "great weight to the congressional finding that major narcotics traffickers pose an especially great danger to the community." *Id.*

In part at least, the Magistrate's decision was premised on defendant Mackie's failure to introduce evidence that would tend to rebut the statutory presumption of un-

reasonable danger. It is true that the terms "rebut" and "rebuttal" appear in the statute. *E.g.* 18 U.S.C. § 3142(e) ("[s]ubject to rebuttal by the person, it shall be presumed...."). In context, however, as noted earlier, "rebuttal" refers to a burden of *production,* not the shifting of a burden of *persuasion.* Thus, all that a defendant need do to "rebut" in this statutory sense is to present evidence tending to show that the facts of his case make it different from the congressional paradigm that gave rise to the presumption. *See Jessup, supra,* at 387. Hence, instead of being required to show that he did not engage in drug trafficking, defendant Mackie may meet his burden of production by presenting evidence supporting an inference that the alleged circumstances of his participation in the offense (as to which probable cause has been found against him) differ in some way from the paradigm for which Congress has mandated a presumption against reasonably assuring safety without detention. To whatever extent the judicial officer credits the evidence and the suggested deviation of the defendant's case from the paradigm, the presumption will have less weight. *Jessup,* 757 F.2d at 387.

On the basis of the entire evidence now before this court, I find that the weight of the evidence and the presumption is not sufficient to constitute clear and convincing evidence that detention of defendant Mackie is required to reasonably assure safety.

In reaching this finding, I have taken account of the fact that in contrast to defendant Shea, whom the government witness testified was described as a cocaine wholesaler and "in charge" of the drug trafficking organization, defendant Mackie was described by Sgt. Dewan as a "day to day manager for Shea," involved in the "cutting and bagging" of the cocaine. Mackie Order at 9. Like the second defendant released in *DiGiacomo* (Antonio Spagnolo), defendant Mackie might "have the capacity to obtain criminal assistance from 'associates'," but likely "does not have the authority to direct other members" of the instant drug trafficking organization. *DiGiacomo, supra,* at 1189. Given defendant Mackie's subsidiary role in defendant

Shea's organization, the risk of harm to any other person or the community from defendant Mackie is less difficult to control with appropriate conditions of house arrest.

In concluding from the evidence that defendant Mackie "is a person prone to violence," the Magistrate relied on two taped conversations that were offered at the hearing before her. At the hearing before this court on September 12, 1990, defendant Mackie offered testimony from his friend John Sweeney that defendant Mackie was drunk at the time of the telephone conversation with Sweeney. Although it overstates the point to say that defendant Mackie and Sweeney were "simply 'running off at the mouth' in a totally innocuous manner," as defendant Mackie's counsel asserts in his memorandum supporting his motion to review the detention order, I find that the circumstances of defendant Mackie's taped threats significantly reduce the weight of verbal threats that, unexplained, seem stronger evidence of a disposition toward violence. Also, I note that a fact finder dealing with spoken threats must be sensitive to the context of speech and to the propensities of many persons, drunk or sober, to engage in hyperbole.

In the second recording, defendant Mackie, once again apparently to some extent under the influence of alcohol, leaves a threatening message on his friend Mildred Flannery's answering machine. At the September 12, 1990 hearing before this court, Ms. Flannery testified that she did not feel threatened by the message, stating that she was accustomed to defendant Mackie's drunken jealous threats.

The Magistrate also emphasized the firearms that Sgt. Dewan testified were found at defendant Mackie's apartment, which, she concluded, indicated that the defendant had access to firearms and thus had the means to act on his statements in the recorded conversations. Mackie Order at 12. Although the firearms, cocaine and drug-related paraphernalia found at defendant Mackie's premises by Sgt. Dewan on January 17, 1990 weigh against defendant Mackie's release, I find that suitable conditions of his release may be ordered that

would sharply reduce the danger posed by his history of access to firearms, drugs and drug paraphernalia. There was, incidentally, no evidence of any actual use of the firearms found at defendant Mackie's premises. In summary, I conclude that detention is not warranted with regard to defendant Mackie, and I will order his release on conditions specified in an Order to be prepared consistently with this ruling.

### C. *Defendant Hogan*

■ In her Memorandum and Order dated August 29, 1990 (Docket No. 124) ("Hogan Order"), Magistrate Bowler determined that detention of defendant Hogan was required to reasonably assure safety. In arriving at this determination, the Magistrate noted defendant Hogan's references on the recorded conversations to the use of force to resolve disputes. Hogan Order at 12. Further, she noted that defendant Hogan "is a close associate of the 'higher-ups,' e.g. Shea and Moore, in the organization." *Id.* After citing defendant Hogan's recent employment at the D Street Deli in South Boston, the site of some of the alleged cocaine transactions that form the basis for part of this action, the Magistrate emphasized defendant Hogan's "significant criminal record, extending over almost thirty years." *Id.* at 12–13.

The Magistrate further relied on some allegedly threatening words uttered on July 25, 1990 by defendant Hogan to Detective Carr, as "a recent example of the defendant's continued propensity to behave in a threatening manner." *Id.* at 11, 13. Finally, the Magistrate noted Detective Carr's description of defendant Hogan as an "enforcer" for the organization, and determined that defendant Hogan's "family ties to the community" were not "sufficient to prevent him from behaving in a violent or intimidating manner." *Id.* at 13.

Defendant Hogan, like defendants Shea and Mackie, may satisfy his burden of production by offering evidence that tends to show that his case is not close to the congressional paradigm. *Jessup*, 757 F.2d at 387. On the basis of the added evidence offered at the hearing before the court, if not alone by the evidence before the Magistrate, I conclude that he has satisfied his burden of production. The issue remains, then, whether the government has satisfied its burden of persuasion.

Defendant Hogan was described by Detective Carr as an "advisor and enforcer" to the cocaine trafficking organization charged in the indictment, and "in touch" with the organizers of the organization. Hogan Order at 9. Also, Detective Carr referred to defendant Hogan's role as a mediator of disputes within the organization. *Id.* Unlike defendant Shea, defendant Hogan does not appear to have had the authority to direct the actions of members of the organization. Consequently, he does not pose the same high risk of conducting illegal activity after release despite stringent conditions of house arrest.

The two tapes that the government used to demonstrate defendant Hogan's willingness to use force to resolve disputes do not weigh heavily in favor of detention. In the first tape, Hogan demonstrates his role as a trusted friend of Walter Bagley, a co-defendant in the initial indictment, and his familiarity with defendant Shea in connection with a drug transaction. In the second tape, Hogan advises his nephew to resort to violence if necessary in a dispute with one of the nephew's rivals. The dispute at issue in the latter conversation was unrelated to drug activity, and the advice was given in the context of an uncle trying to tell his nephew how to solve his own personal problems. Although the evidence of such advice is relevant on the issue of defendant Hogan's alleged willingness to resort to violence, the context of the conversation gives it limited weight as to the central issue in this detention decision.

Defendant Hogan's criminal record covering the years 1962–1986, especially the fact that he was convicted of violent crimes as recently as 1983 (Assault & Battery with a Dangerous Weapon and Assault & Battery with Intent to Kill), though also relevant, do not establish an uncontrollable propensity to engage in illegal activity despite stringent conditions of release. No evidence was offered that defendant Ho-

gan committed criminal activities while out on bond in connection with other matters.

Having considered also the evidence regarding defendant Hogan's allegedly threatening reference to Detective Carr's home on the Cape, I conclude that the government has not met its burden of persuasion. Defendant Hogan's statement to Detective Carr, "You have quite a nice house down there," (Hogan Order at 11) was ambiguous. Although Detective Carr might reasonably have interpreted defendant Hogan's remark to be a threat, the nature of the statement under the circumstances does not establish sufficient dangerousness on the part of defendant Hogan to support a finding that stringent conditions of release would be insufficient to reasonably assure safety.

On the basis of the foregoing considerations, I conclude that defendant Hogan must be released on conditions to be specified by Order of the court.

### ORDER

For the foregoing reasons, it is ORDERED:

(1) Defendant Shea's motion to revoke or amend the Magistrate's detention order (Docket No. 91) is denied.

(2) Defendant Mackie's motion to revoke or amend the detention order (Docket No. 93) is allowed. Accordingly, at 1:00 p.m. on October 12, 1990, or as soon thereafter as he has satisfied the prerequisites for his release, defendant Mackie shall be released pending trial. Counsel are directed to confer for the purpose of fashioning a proposed Order, specifying conditions of release, and if unable to agree on a recommended Order may submit their separate proposals to the court forthwith.

(3) Defendant Hogan's motion to revoke the detention order (Docket No. 209) is allowed. Accordingly, at 1:00 p.m. on October 12, 1990, or as soon thereafter as he has satisfied the prerequisites for his release, defendant Hogan shall be released pending trial. Counsel are directed to confer for the purpose of fashioning a proposed Order, specifying conditions of re-

lease, and if unable to agree on a recommended Order may submit their separate proposals to the court forthwith.